ESTATE OF RICHARD M. FROST, DECEASED, DIANA L. FROST, EXECUTOR; DIANA L. FROST; CYNTHIA L. BUTLER; RICHARD M. FROST, JR.; LAURIE A. JACOBS TRUST, DIANA L. FROST, TRUSTEE; AND RICHARD M. FROST TRUST, DIANA L. FROST AND RICHARD M. FROST, JR., TRUSTEES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Frost v. Commissioner
Docket No. 17333-89
United States Tax Court
T.C. Memo 1993-94; 1993 Tax Ct. Memo LEXIS 89; 65 T.C.M. (CCH) 2101; March 18, 1993, Filed *89 W, D's spouse and executor of D's estate, filed gift tax returns showing that no tax was due upon D's transfer of 60 percent of the stock in his wholly owned corporation to two of his children in 1982 and the transfer of the remainder of the stock to them in 1983. W filed an estate tax return for D's estate reporting no taxable gifts. W also elected to take her statutory share of D's estate. She thereby claimed a one-third interest in certain real estate. Pursuant to a subsequent agreement, she ceded that real estate to D's sons. 1. Held: R has failed to prove by clear and convincing evidence fraud on the part of either D or W regarding the transfer of stock. 2. Held, further, the estate may not include in the marital deduction the value of the real estate that W ceded to the sons. 3. Held, further, W is liable for unpaid estate taxes as a fiduciary and as a transferee, and D's son and D's testamentary trust are liable as transferees. For petitioners: Mark S. Coco and Robert T. Pappas. For respondent: Ronald T. Jordan. WHITAKER
WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in the Federal *90 estate tax of the Estate of Richard M. Frost, Deceased (the Estate) of $ 401,884, plus additions to tax of $ 200,942. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the following: (1) Whether any part of the asserted deficiency in estate taxes is due to fraud; (2) whether the Estate is entitled to a marital deduction for the value of certain interests in real estate that decedent's widow received in making an election against the will; and (3) whether, and, if so, to what extent, decedent's beneficiaries are liable for the asserted deficiencies in estate taxes and additions to tax. In an Amendment to Answer to Petition, respondent also asserted that petitioners are liable for additions to tax under the provisions of section 6653(a)(1) and (2). Respondent has not advanced that position at trial or on brief, and we deem it to be abandoned. See Rule 151(e); Wilcox v. Commissioner, 848 F.2d 1007, 1008 n.2 (9th Cir. 1988), affg. T.C. Memo. 1987-225; Rockwell International Corp. v. Commissioner, 77 T.C. 780, 837 (1981), affd. 694 F.2d 60 (3d Cir. 1982). *91 FINDINGS OF FACT Some of the facts have been stipulated and are so found. All petitioners were residents of Sunbury, Ohio, when the petition was filed, except for petitioner Richard Frost, Jr., who resided in Johnstown, Ohio. In the years before 1966, decedent operated a trucking business known as Frost Motor Express. He sold that business in 1966 and started another trucking business that dealt in hauling produce. He engaged Mr. Paul Beery, an attorney who specialized in motor transport law, to represent his business before Ohio's Pubic Utilities Commission and the Interstate Commerce Commission. Mr. Beery also assisted decedent in the formation of his various corporations. Decedent married petitioner Diana Frost (Diana) in 1966. He had two children by a previous marriage, petitioner Richard Frost, Jr. (Richard), and Theodore Frost (Theodore). After his marriage, he adopted Diana Frost's two daughters, petitioner Cynthia Butler (Cynthia) and her sister Laurie Jacobs. In the early 1970's, decedent branched out into other business activities, including the construction of houses and apartments, the acquisition of real estate in and around Columbus, Ohio, the acquisition *92 of one-half of the stock of Homeland Carpet Mills, Inc., a Georgia manufacturing concern, and the acquisition of stock in Home Equipment Co., a corporation that sold and serviced forklift devices. Decedent formed another corporation, Home Carpet Distributors, Inc. (HCD), late in 1980. He originally owned all 100 of HCD's issued and outstanding shares. Decedent steered some of HCD's shipping business to his son Richard, who was then operating his own trucking business. In 1980, decedent put Richard on the HCD payroll. In 1982, decedent formed Home Cushion Co., a corporation that manufactured carpet padding. It operated as a subsidiary of HCD. Cynthia Butler, decedent's adopted daughter, had worked at decedent's office during summers and on weekends, beginning in 1972. In 1976, she worked as a keypunch operator for the Ohio Highway Patrol. She continued this job until 1984, when, at her father's request, she went on the payroll of HCD. In the early 1980's, decedent occasionally indicated that he wanted Richard and Cynthia to succeed him as owners of HCD. On a few occasions, decedent attempted to give stock certificates in HCD to Richard, who declined to take them. Theodore, *93 decedent's younger son, completed 2 years of study at Ohio State University. In 1972, he moved to California to pursue an acting career. He worked for 10 or 11 years for a florist's business, then, with a $ 2,000 advance from his father, started a delivery business in California. Theodore did not get along well with Diana, his father's new wife. At the beginning of 1984, decedent's business ventures were prospering. He submitted a balance sheet to the Huntington National Bank listing his personal assets. The fixed assets included real estate valued at $ 1,854,790 (subject to mortgages of $ 388,035), stock of Homeland Carpet Mills valued at $ 361,491, stock of HCD valued at $ 210,844, stock of Home Equipment Co. valued at $ 58,600, and stock of Home Cushion Co. valued at $ 8,150. In May 1984, decedent, who was then 56 years old, discovered that he had cancer. Surgery was scheduled for May 22, 1984. In anticipation of not surviving the surgery, decedent called his attorney Mr. Paul Beery about preparing a will. Mr. Beery referred decedent to Mr. James Jones, an attorney who specialized in estate planning and Federal taxation. On May 19, 1984, 3 days before the operation, *94 Mr. Jones met with decedent in the hospital to discuss decedent's estate plan and proposed disposition of assets. When discussing his estate plan with Mr. Jones, decedent asked his wife and children to leave the hospital room, unless he had something specific to discuss with them. Among other things, decedent told Mr. Jones that he wanted the HCD stock to be given equally to Richard and Cynthia. Mr. Jones and his associates "burned a lot of midnight oil" preparing will and trust documents. Mr. Jones returned to the hospital 2 days later and discussed the documents he had drafted with decedent, who signed them. In the Last Will and Testament that Mr. Jones had prepared, decedent bequeathed three parcels of real estate to the trustees of the "Richard M. Frost Trust". Decedent also transferred to the trust the following: A. All of my stock of any class in Home Land Carpet Mills, Inc., a Georgia corporation having a mill in Dalton, Georgia. B. All of my stock of any class in Home Carpet Distributors, Inc., an Ohio corporation having its principal office in Columbus, Ohio. C. All of my stock of any class in Home Equipment Co., Incorporated, an Ohio corporation having its principal *95 office in Columbus, Ohio.
From the trust corpus, there were established two subordinate trusts. Trust A was to be funded with a 17-unit apartment project that decedent owned. That trust was for the exclusive benefit of decedent's adopted daughter Laurie Jacobs. Decedent expressed his belief that her situation was such that she would benefit from having a trustee manage that property. Trust B was structured to allow decedent's wife an income interest for life, with the remainder going to Richard and Cynthia. The trustees were Diana, Richard, and Cynthia. Decedent made these dispositions into a trust at Mr. Jones' suggestion, so that the bulk of the assets would qualify for an estate tax marital deduction. Decedent also expressed concerns that Theodore would cause problems for Diana Frost. Accordingly, his will provided an outright bequest to Theodore Frost of two parcels of real estate, located on East Fifth Avenue and Woodland Avenue in Columbus, Ohio. While he was in the hospital, decedent talked with his adopted daughter Cynthia and told her that she "had" 50 percent of the HCD business, and, hence, that she was getting nothing additional in his will. Decedent survived *96 the operation and returned to work at HCD. In August 1984, however, he discovered that the operation had not cured his cancer. At that time, decedent successfully urged both Richard and Cynthia to work at HCD. On September 13, 1984, decedent signed HCD's corporate income tax Form 1120. The Form 1120 had been prepared by a bookkeeping service which had signed as "Preparer" the day before. The same bookkeeping service had prepared each of HCD's prior income tax returns. Each of them, including the one signed by decedent in 1984, indicated that decedent was the owner of 100 percent of HCD's stock. Decedent got back in touch with his attorney Mr. Paul Beery in October 1984, with questions about making gifts of stock and other assets to his children. He also requested possession of the HCD books that theretofore had been in Mr. Beery's offices. Mr. Beery directed Mr. Michael Spurlock, an attorney in his office, to address decedent's inquiries. Mr. Beery also directed that the HCD books be checked to make sure they were current. Mr. Spurlock prepared a one-page memorandum. Therein he advised decedent against making gifts during decedent's lifetime. He noted that a gift tax *97 might be due, "or, at the very least, a gift tax return will have to be filed for the current year. This would also be true for any gifts you made in prior years". Mr. Spurlock noted that a transfer of property at death would produce a tax basis for the beneficiaries that was equal to the current fair market value of the property. The result would be that the beneficiaries' sale of the property would produce lower capital gains taxes than would be the case with a transfer during decedent's life. Mr. Spurlock thus recommended that decedent "consider making these gifts in your Will instead of making a gift at this time". He advised that the corporate minutes and the stock ledger "must be consistent". At the time he got this memorandum, decedent also received HCD's corporate record book from Mr. Beery's office. He returned it in February 1985, together with the HCD stock ledger and stock certificates. Mr. Beery then assigned another attorney, Mr. Daniel Ryan, to look over HCD's corporate records. Mr. Ryan noted that the share journals reflected that decedent had transferred his HCD stock. The journal showed that decedent had given 30 shares each to Richard Frost, Jr., and Cynthia *98 Butler on July 1, 1982, and that he had given 20 shares each to Richard and Cynthia on July 1, 1983. The journal failed to reflect, however, that the shares originally issued to decedent had been reissued. The books thus reflected that HCD had issued more shares than were authorized. The corporate books also lacked other materials, such as corporate minutes reflecting the election of officers and directors. Mr. Ryan telephoned Ms. Frances Wolfe Sanders, who had served as HCD's corporate secretary and as decedent's office supervisor. She informed Mr. Ryan that the transfers of HCD stock had taken place "over several years". During an ensuing discussion that lasted approximately half an hour, Mr. Beery and Mr. Ryan determined that the best course would be to correct decedent's recordkeeping. They agreed to cancel the old stock certificates and to issue new certificates to reflect the transfers of only the shares authorized. They would then destroy the old certificates and share journal to avoid confusion. Mr. Ryan accordingly prepared new stock certificates and journal entries. After he had done so, the share journals and certificates reflected the following information. *99 Stock Certificate No. 1 was the original stock certificate reflecting the issuance of 100 shares to decedent on January 1, 1981. Mr. Ryan made a contemporaneous written notation that "This has been signed pursuant to the first sale of stock to Cindy and Dick". Stock Certificate No. 2 represents that Richard held 30 shares of HCD as of July 1, 1982. Mr. Ryan noted "This certificate is complete". Mr. Ryan then prepared four replacement stock certificates to reflect the remaining transfers as he understood them to have taken place, based upon the original share journal. He corrected the replacement shares, however, to show the proper numerical sequence and number of shares. Stock Certificate No. 3 reflects that Cynthia held 30 shares as of July 1, 1982. Mr. Ryan noted: "This needs to be signed by Dick [decedent] as President and Fran as Secretary". Stock Certificate No. 4 reflects that decedent retained the 40 shares remaining after his gifts of the 30 shares each to Richard and Cynthia. Mr. Ryan noted: "This needs to be signed by Dick as President and Fran as Secretary. Dick also needs to sign the back of the stock certificate as these shares were subsequently transferred". *100 Stock Certificates Nos. 5 and 6 reflect the ownership, as of July 1, 1983, of 20 shares of HCD each by Richard and Cynthia. As to each certificate, Mr. Ryan again noted: "This needs to be signed by Dick as President and by Fran as Secretary". Mr. Ryan forwarded the replacement shares to Mr. Beery. Mr. Beery issued a memorandum to the file stating -- Dick Frost gave 30 shares each to Cindy and Dick, Jr. in '82 * * * Then he gave each of them 20 shares of stock in 83. Thus, he, in fact, over the two years gave away all of his shares of stock. He did it himself and in a clumsy manner. We went back and corrected those shares.
Mr. Beery then obtained decedent's signatures and those of Frances Wolfe Sanders on the replacement certificates in accordance with Mr. Ryan's suggestions. At the same time, Mr. Beery notified Mr. James Jones of decedent's gifts of stock to Richard and Cynthia. Mr. Beery also notified Mr. Jones that decedent had sold his 17-unit apartment project on Oakland Park Avenue and that he had transferred his Melrose Avenue property to his younger son, Theodore. Mr. Jones responded by urging that decedent change his will. The old will -- the one decedent *101 had executed on the day before his cancer operation in May 1984 -- had bequeathed the HCD stock to a trust. It had also funded another trust for Laurie Jacobs with both the Oakland Park Avenue property that decedent had since sold, and the Melrose Avenue property that decedent had since given to Theodore. In May 1985, decedent talked to Mr. Jones. Decedent stated that he was dying and wanted to execute a new will. Decedent, his wife, Mr. Jones, and Mr. Beery met late in May 1985. Mrs. Frost sat in while the parties discussed whether sufficient property had been provided to Theodore so that he would not make trouble for the other family members. At her husband's request, she excused herself from other discussions. Decedent's new estate plan included the formation of two trusts. The first trust was the "Richard M. Frost Trust" (hereafter the Trust). The corpus of the Trust was to be the stock in Homeland Carpet Mills, Inc. The Trust would pay its income to decedent's wife for life, with the remainder to Richard and Cynthia. The second trust was for the benefit of Laurie Jacobs; it was funded with proceeds from decedent's sale of the 17-unit Oakland Park apartment property. *102 Decedent's will also gave decedent's son Richard the Parsons Avenue property, which served as HCD's business premises. Decedent ignored Mr. Jones' advice in this regard, explaining that he wanted to give his son additional leverage in case any dispute arose between his son and Cynthia Butler concerning HCD's operation. Like the old will, decedent's new will gave Theodore the East Fifth Avenue and Woodland Avenue properties. All the residuary of decedent's Estate went to his wife Diana. After decedent had signed the will and trust instruments on June 6, 1985, he asked Mr. Jones to prepare figures showing his potential exposure to estate taxes. Mr. Jones and Mr. Beery and their associates hastily obtained calculations showing that the amount of the taxable estate would be approximately equal to the unified estate and gift tax credit then available under Federal estate tax statutes. The unified credit would thus eliminate most, if not all, Federal estate taxes. Decedent then indicated that, because his will and trust instruments had accomplished his goals, he did not wish to change them, even if doing so would save a few thousand dollars in estate taxes. On July 1, 1985, Mr. *103 Jones telephoned Mr. Beery asking for some information concerning the HCD stock. On July 2, 1985, Mr. Jones wrote to decedent urging that he authorize filing gift tax returns for the earlier transfers of the HCD stock. Based upon HCD's past income tax returns, and his understanding of the business, Mr. Jones urged that the stock be valued at the book value of the company -- some $ 128,000. On July 8, Mr. Beery wrote to Mr. Jones, emphasizing that decedent's transfers of HCD stock had taken place in 1982 and 1983. He advised that HCD was a "high risk business", that it had a lot of problems in collecting its accounts receivable, and that HCD could not obtain financing without decedent's personal guarantee. Decedent's bookkeeping service determined a "book value" for the stock of HCD as of June 30, 1982, and June 30, 1983. It recommended that the value of the stock be reduced to reflect interest on shareholder loans. On July 24, 1985, an attorney in Mr. Beery's office responded, accepting the proposed valuation. Decedent died on July 28, 1985. Diana was the executor of his Estate. After decedent died, Diana, as executor, referred questions about the administration of the Estate *104 to the lawyers, telling them that she hoped that they knew what was right. A letter to Diana from one of the Estate's lawyers, dated December 13, 1985, stated: "Through the joint efforts of Dick and myself, we were able to pretty well fix the value for estate tax purposes. These may be undertaxed, but they were certainly, I think, in a defendable position". In April 1986, Diana filed United States Gift Tax Returns for the years 1982 and 1983. The first reflected that decedent had given 30 shares of HCD stock each to Richard and Cynthia on July 1, 1982. The second reflected that decedent had given 20 shares of HCD stock each to Richard and Cynthia on July 1, 1983. The returns reported the values as determined by decedent's bookkeeping service. They indicated that the value of the stock was $ 564.76 per share in 1982 and $ 631.75 per share in 1983. The gifts were treated as made by both decedent and Diana for each year. Application of their annual exclusions resulted in no Federal gift taxes reported or paid. On April 28, 1986, decedent's Estate filed a Form 706, United States Estate Tax Return; it was signed by Diana as executor. The return indicated a gross estate of $ *105 1,325,660.35, with deductions of $ 952,462.21. Most of this amount was attributable to the marital deduction, which included as "qualified terminable interest property" the value of the assets transferred into trust. The taxable estate was listed as $ 373,198.14. This resulted in a tentative tax of $ 119,369.94. The unified credit against estate tax was $ 121,800, eliminating any estate tax liability. Respondent sent a letter to the Estate in December of 1986, advising that respondent had begun an examination of the Estate's tax liabilities. A memo between two of petitioners' attorneys dated December 30, 1986, stated -- Steve, in representing Jr., I think you have to address the problem as to federal estate taxes.
On January 5, 1987, in accordance with provisions of Ohio law, Diana elected to take her statutory share of decedent's Estate in lieu of the provisions for her under the will. This election entitled her to receive a statutory one-third share in the Parsons Avenue property, valued at $ 240,000, that decedent has bequeathed to his son Richard. The election also entitled her to a one-third interest in the East Fifth Avenue and Woodland Avenue properties that *106 decedent had bequeathed to his son Theodore. Together, these latter two properties were valued at $ 200,000. By electing against her husband's will, Diana stood to gain somewhat financially. Her principal reason for electing against the will, however, was to strengthen the bargaining position of her daughter Cynthia. A dispute had arisen between Cynthia and Richard concerning the operation of HCD after their father had died. A second dispute arose when, on June 27, 1987, Theodore filed a probate court action, seeking a declaratory judgment that Diana had not properly elected against the will. He named as a defendant Diana, individually, as the executor of the Estate, and also in her capacity as a trustee of the Trust. He also named as defendants Richard and Cynthia, individually and in their capacities as trustees of the Trust, and Laurie Jacobs, individually. The parties subsequently resolved their differences. Each of them, including the Trust and the Estate, was represented by counsel. They set forth their agreements in a settlement agreement filed in Theodore's will-contest action. The first agreement, entitled "Settlement Agreement and Release", resolved the dispute *107 involving Richard, Diana, and Cynthia. It recited that the Estate would face unnecessary expenses if it were administered without an agreement. It provided: Without this Agreement, it would be necessary to institute legal proceedings to recover assets distributed to the Trust, to sell assets of the Estate, and to obtain reimbursement of the Trust from other beneficiaries of the Estate. The cost to all parties of such proceedings and the almost certain loss to be suffered as the result of forced sales of the Estate's assets would be detrimental to all parties. THEREFORE, the parties have entered into this Agreement in order to establish the procedure to be followed to meet the obligations of the Estate and to finalize the allocation and distribution of the assets of the Estate among its beneficiaries.
With respect to her share of the Estate's personal property, Diana agreed to take a house trailer and a bulldozer, plus other miscellaneous household goods and personal effects worth $ 1,000. She agreed to buy the real estate in the residuary of the Estate for $ 25,100, against which she received a credit for cash she had advanced to the Estate. She agreed to take $ 10,000 *108 in satisfaction of her rights to the assets of the Trust. She further agreed to resign as a trustee of the Trust. She received her one-third interest in the Parsons Avenue, East Fifth Avenue, and Woodland Avenue properties -- the properties that decedent had bequeathed to Richard and Theodore -- as a tenant in common with each of them. The Trust agreed to purchase from the Estate a note for $ 65,424.68 issued by Home Equipment Co. It agreed to pay administrative and other expenses, including any estate taxes, in amounts exceeding the purchase price of the note. Diana, her daughter Cynthia, and Richard reached a further understanding with respect to HCD. Diana agreed to transfer to Richard her one-third interest in the Parsons Avenue property. This was incorporated into the settlement agreement in an "Addendum to Settlement Agreement and Release". Richard agreed to accept this interest as part of his 50-percent share in the assets of HCD, which would be liquidated. A separate liquidation agreement took into account, somewhat obliquely, the fact that Richard would receive part of the liquidation proceeds in the form of the Parsons Avenue property. It stated: Mr. Frost [Richard] *109 and Mrs. Butler [Cynthia] acknowledge that the distributive shares upon the liquidation of the corporation do not appear, on its [sic] face, to balance equally. Mr. Frost waives any rights he may have under the Plan of Liquidation to additional value of corporate assets upon liquidation in order to settle the liquidation and avoid further expense.
As to the other dispute, Diana entered into an agreement with Theodore. Pursuant to that agreement, she agreed to transfer to Theodore her one-third share of the East Fifth Avenue and Woodland Avenue properties that decedent had originally bequeathed to Theodore. Theodore agreed to dismiss his declaratory judgment action with prejudice. All of the parties -- Theodore, as plaintiff, and Diana, Richard, Cynthia, Laurie Jacobs, the Trust and the Estate, as defendants -- executed a "Settlement Agreement Relating to Declaratory Judgment Action" which set forth the agreement. They submitted this agreement to the Delaware County Probate Court. That Court entered a judgment dismissing Theodore's complaint with prejudice. It also entered an order which stated as follows: It is hereby ORDERED that the Settlement Agreement and Release *110 and the Settlement Agreement Relating to Declaratory Judgment Action presented to the Court are APPROVED and that the Executor and all parties are ORDERED to proceed with the distribution of estate assets in accordance therewith.
Diana, as executor, thereafter distributed the Estate's property in accordance with the agreement. In so doing, she transferred $ 475,000 to the Trust, based upon an arm's-length settlement of a buyout agreement for the Home Carpet Mills stock which decedent had originally bequeathed to the Trust. The Federal estate tax return had indicated that no estate taxes were due, and she paid none. Respondent, on April 17, 1989, issued to the Estate a notice of deficiency asserting a deficiency in estate tax and additions to tax. On the same date, respondent issued a notice of fiduciary and transferee liability regarding the asserted deficiency and additions to tax to Diana L. Frost. Also on April 17, 1989, respondent issued separate notices of transferee liability regarding the same asserted deficiencies and additions to tax to Richard M. Frost, Jr., to Cynthia L. Butler, to the Laurie A. Jacobs Trust, and to the Richard M. Frost Trust. Each of the persons *111 to whom the notices were addressed joined in a timely filed petition to this Court. Respondent has since stipulated that Cynthia and the Laurie A. Jacobs Trust are not transferees of decedent's Estate. The parties have stipulated that when the HCD stock was effectively transferred to Richard and Cynthia its value was $ 450,000. OPINION Issue 1. Additions for Fraud
We first consider whether some part of the asserted deficiency in estate taxes is due to fraud. Section 2001 [1] imposes a tax upon the taxable estate, plus taxable gifts, less gift taxes already paid. Respondent contends that the failure to report, as gifts, the value of the HCD stock in 1984 fraudulently lowers the amount subject to estate taxes. Respondent urges that decedent first attempted to transfer his HCD stock to Richard and Cynthia in 1984. Respondent further contends that, when he did so, decedent also fraudulently backdated the HCD stock certificates to indicate that he had made such transfers in 1982 and 1983 when the value of the HCD stock was allegedly much lower. Respondent asserts that this backdating occurred in or after October 1984 -- after decedent's cancer operation, and after decedent *112 had visited Mr. Beery's offices to pick up HCD's corporate record book. Petitioners disagree. They contend that decedent, acting on his own, filled out and endorsed some stock certificates and a share journal in 1982 and 1983, in attempting to transfer the HCD stock to Richard and Cynthia. They concede that the transfers may not have been effective for tax purposes, because decedent retained effective control of HCD even after he transferred, or sought to transfer, its stock. [2] They argue, however, that decedent's failure to make legally effective gifts does not amount to fraud. *113 Section 6653(b)(1) imposes an addition to tax of 50 percent of the underpayment of tax when any part of the underpayment is due to fraud. Section 6653(b)(2) further imposes an addition to tax of 50 percent of the interest payable on the part of the underpayment that is attributable to fraud. Respondent has the burden of proving fraud by "clear and convincing" evidence. Sec. 7454(a); Rule 142(b); Hagaman v. Commissioner, 958 F.2d 684, 696 (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549. Respondent must show that the taxpayer "intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes." Hagaman v. Commissioner, supra (citing United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990)); Rowlee v. Commissioner, 80 T.C. 1111 (1983). Such intent can be inferred from strong circumstantial evidence. Hagaman v. Commissioner, supra.
Fraud is not to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). *114 It must be affirmatively established. Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). We do not find fraud under "circumstances which at the most create only suspicion." Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); Parks v. Commissioner, 94 T.C. 654, 665 (1990). Respondent has not borne the burden of proving fraud in the understatement of estate taxes by "clear and convincing evidence". Much of the evidence in fact indicates that decedent at least thought he had made valid transfers of the HCD stock to Richard and Cynthia in 1982 and 1983. Initially it appears that decedent's gifts, or attempted gifts, of the HCD stock to his children were consistent with his long-held plans. He had previously stated that he had meant to turn the business over to Richard and Cynthia. On a number of occasions, decedent had offered the stock certificates to Richard, who declined to take them. When decedent was first in the hospital, before his cancer operation in 1984, he told his daughter Cynthia that she already "had" the stock, and therefore, that he would make no further provision for *115 her in his will. Moreover, Mr. Spurlock, an attorney in Mr. Beery's office, prepared a memorandum after decedent's surgery in which Mr. Spurlock discussed decedent's making gifts of stock. Mr. Spurlock's memorandum addressed not only potential gifts but also any "gifts made in prior years". The memorandum thus offers some indication that, before he picked up the corporate record books, decedent had already transferred the stock to Richard and Cynthia. There is additionally the matter of the stock certificates themselves. The Court has examined all the certificates, including the replacement shares that were prepared pursuant to Mr. Ryan's and Mr. Beery's decision to correct decedent's faulty corporate recordkeeping. We have found that, on or about January 1, 1981, decedent and his secretary Frances Wolfe Sanders signed Certificate No. 1, which represents the 100 shares originally issued to decedent. Stock Certificate No. 2, which indicates a transfer in 1982 of 30 shares from decedent to Richard, also bears the signature of decedent and Frances Wolfe Sanders. Their signatures on Certificate No. 2 are virtually identical to the signatures appearing on Stock Certificate No. 1. *116 Decedent's signature on both certificates is more forceful than it appears on the replacement shares signed after he became ill. Ms. Sanders' signature, especially the "W" in "Wolfe" (her maiden name) appears the same on Certificates No. 1 and No. 2, but it differs on the replacement certificates she signed in 1985. The Court questioned Ms. Sanders closely with respect to the specific date she signed Certificate No. 2. Although she had been called by respondent to support the allegation of backdating, she could not preclude the possibility she had signed Certificate No. 2 on July 1, 1982, the date it bore. [3]
Signatures on the certificates thus indicate that the initial transfer of stock to Richard may have taken *117 place on its recited date of July 1, 1982, rather than later, in 1984 or 1985, when decedent was ill. [4] This offers some indication that decedent undertook to transfer the stock to Richard and Cynthia when he said he did. *118 Moreover, the alleged estate tax avoidance scheme, which decedent presumably developed late in 1984, would have been at odds with the legal advice concerning taxes that decedent had received earlier. Backdating the transfer of the HCD stock in October 1984 would have been inconsistent with his then-current will, which, at Mr. Jones' suggestion, protected the HCD stock from estate taxes by placing it, together with other assets of the Estate, into a marital deduction trust. Additionally, backdating the transfer of the HCD stock would have gone against the earlier tax advice of another lawyer, Mr. Spurlock, who advised decedent to transfer the stock in his will, rather than doing so during his lifetime. The more plausible explanation for decedent's actions is that he had attempted to transfer the stock when he said he did -- before he received legal advice from Mr. Jones and Mr. Spurlock. In this respect, we note again Mr. Spurlock's memo, which discusses "any gifts made in prior years". Respondent advances several arguments in attempting to prove fraud. To demonstrate that decedent in fact backdated the HCD stock certificates after his operation in 1984, respondent points to *119 the fact that decedent's May 1984 will disposed of his stock, an unlikely event if decedent had given away that stock 1 or 2 years earlier. Respondent's theory apparently is that when, in October 1984, decedent allegedly backdated the stock certificates to reflect transfers to his children in 1982 and 1983, he forgot that he had treated the stock as his own in the will he had signed in May 1984. We think it more likely that, when decedent signed the 1984 will before his operation, he simply failed to realize that the will transferred into trust the HCD stock that he had earlier undertaken to give to Richard and Cynthia. There is no dispute that decedent's 1984 will was prepared in great haste. For tax purposes, decedent's will transferred into trust three parcels of real estate and the stock of two other corporations, as well as the HCD stock. It was Mr. Jones' idea, and not decedent's, to place this stock, along with other corporate stock and parcels of real estate, into a marital deduction trust to protect those assets from estate taxes. At that time, the HCD stock would not have represented a major part of decedent's assets. Decedent's personal balance sheet shows that, *120 in terms of relative value, the HCD stock ranked behind the $ 1.8 million in real estate holdings, and the $ 310,000 Homeland Carpet Mills stock, but ahead of the stock in Home Equipment Co. and Home Cushion Co. Finally, decedent signed the will and trust documents on the day before he underwent potentially life-threatening surgery for cancer. Under these circumstances, and in view of the seriousness of his personal situation, we can easily accept the premise that decedent simply overlooked the unintended inclusion of the HCD stock as part of the assets he transferred into trust. [5]
*121 Respondent also points out that in 1984, decedent signed both HCD's Federal income tax return and a statement of personal assets submitted to a Columbus bank, and that both documents indicated that decedent still owned the HCD stock. Respondent argues that these documents show that, sometime after their execution, decedent fraudulently backdated HCD's stock certificates. We find equally acceptable the explanation that these documents were prepared by decedent's bookkeeper, who was not aware that decedent had attempted to transfer his stock. In the context of the documents in which they appear, these statements of stock ownership were relatively minor entries. Decedent may not have noticed them, and if he had, he may not have thought correcting them was worth the effort. [6]
*122 Respondent's principal reliance for the demonstration of fraud is the testimony of Frances Wolfe Sanders, decedent's secretary. She testified that after he became sick (that is, in 1984 or 1985), decedent had asked her to execute some backdated stock certificates. She said that decedent had told her that the backdating "had to do with tax purposes". She then testified that decedent asked her to sign a "second" set of stock certificates, within 3 or 4 months of decedent's death. We have difficulty with Ms. Sanders' testimony. We note again that, in response to questioning by the Court, she could not specify to the Court that she had not signed at least one of the stock certificates -- No. 2, which transferred 30 shares to Richard -- on July 1, 1982, the date it bore. Moreover, we have found that in 1985 she told Mr. Ryan, the attorney in Mr. Beery's firm, that the stock had been transferred to Richard and Cynthia "over several years". Further, in her initial interview with agents of the Internal Revenue Service, she failed to inform those agents of decedent's alleged backdating. She instead told them that she signed the original stock certificates before decedent got sick. *123 Nor did she tell respondent's agents of decedent's alleged statement that he had transferred the stock for tax purposes. She did tell the agents of a "second" set of certificates that she had signed in 1985. It is clear, however, that at that time she had reference to the replacement shares prepared by the law firm, and not to some other backdated shares that decedent had her sign earlier. On balance we find Ms. Sanders' testimony inconsistent and unconvincing. It is not the type of "clear and convincing evidence" necessary to impose upon the Estate the additions to tax for fraud. We understand respondent's suspicions about decedent's delayed revelation of his transfers of the HCD stock. We are also aware that fraud is generally proved by circumstantial evidence, and that such evidence is to be viewed cumulatively to determine whether fraud exists. Bahoric v. Commissioner, 363 F.2d 151, 154 (9th Cir. 1966). But here, all of respondent's evidence, taken together, falls short of leaving us with the conviction of the central fact necessary -- that decedent intended to defraud the Government by calculated tax evasion. Iley v. Commissioner, 19 T.C. 631, 634 (1952). *124 Respondent's failure to prove fraudulent conduct on the part of decedent precludes the necessity of our revisiting the case of Estate of Kahr v. Commissioner, 48 T.C. 929, 936-937 (1967) (Court-reviewed), revd. 414 F.2d 621 (2d Cir. 1969). There, decedent secretly diverted partnership receipts to himself in 1958 and 1959. He concealed his diversion from his partners by keeping two sets of books. He died in 1960, after destroying the accurate set of books. His executor filed his 1959 Federal income tax return, upon which decedent's income tax liability was understated. Respondent asserted deficiencies and additions to tax for fraud. We refused to accept respondent's additions for fraud. We stated that fraudulent intent must be present when the return is filed, and that such intent must be to file a fraudulent return. We declined to impute decedent's fraud to his executor. Here, respondent has not proved fraud on the part of decedent, and the issue presented in Estate of Kahr is not before us. Mindful of our holding in Estate of Kahr, however, respondent has attempted to demonstrate that decedent's wife Diana, *125 who signed the estate tax return as executor, was at that time aware of decedent's fraud. Respondent urges that she shared decedent's fraudulent intent and that she intended to, and did, file a fraudulent return. Respondent asserts "that she is much more sophisticated and knowledgeable than she attempted to portray on the witness stand". We are not persuaded that respondent's assertions in this regard are relevant, given respondent's failure to prove fraud on the part of decedent. In any event, respondent's allegations concerning decedent's wife depart from the evidence. Indeed, all the credible evidence shows that decedent did not discuss business matters with his wife. She knew the nature of decedent's business, but that was about all. There is no other evidence that Diana had any knowledge of operations of the business, or of decedent's disposition of stock. When decedent discussed his Estate with his lawyers, he asked Diana to leave the room, unless the issues pertained to her directly. After decedent died, Diana, as executor, referred questions about the administration of the Estate to the lawyers, telling them that she hoped that they knew what was right. As far as *126 Diana knew, the transfer of stock to Richard and Cynthia was entirely consistent with decedent's long-held plans for its disposition. On this record, there is no reason to suspect that she knew of any backdating that respondent asserts had taken place. Respondent further makes the facile assertion that decedent's lawyers must have been aware of fraudulent backdating and would certainly have notified Diana, as executor. These contentions again take liberties with the evidence. Respondent faults decedent's lawyers for believing decedent's claims that he had undertaken to give the HCD stock to Richard and Cynthia in 1982 and 1983. Respondent apparently believes that decedent's lawyers should have detected the alleged backdating scheme. We note, however, that when decedent's lawyers learned of decedent's reported prior transfers, one of them, Mr. Ryan, called decedent's secretary, Frances Wolfe Sanders. She confirmed that the stock transfers had taken place over several years. Mr. Ryan and Mr. Beery then agreed that the records should be corrected to reflect such transfers properly. Mr. Beery made a memo to the file to that effect. Mr. Ryan's telephone call to Ms. Sanders and *127 Mr. Beery's memo are plainly inconsistent with an attempt to cover up a client's backdating scheme. Decedent's lawyers were of course aware that decedent's 1984 will attempted disposition of the stock in a manner that was inconsistent with his prior gifts of that stock to Richard and Cynthia. As already discussed, however, decedent's lawyers reasonably believed that, in reviewing his will the day before his cancer operation, decedent had overlooked his proposed testamentary transfer of the HCD stock into a trust. [7]
In view of the foregoing, respondent has failed to prove any case for fraud, by anyone, in connection with the understatement of estate taxes at issue in this case. Issue *128 2. The Marital Deduction
The next issue we must decide concerns the extent of the marital deduction. Petitioners have claimed as a marital deduction the amount to which Diana would have been entitled by making her election against the will. That election would have included a one-third interest in the Parsons Avenue property that decedent had bequeathed to Richard, and a one-third interest in the East Fifth Avenue and Woodland Avenue properties that decedent had bequeathed to Theodore. Respondent contends that the marital deduction is limited to the amounts that Diana received pursuant to her settlement of the disputes that had arisen with decedent's two sons. That amount specifically does not include any interest in the Parsons Avenue, Woodland Avenue, or East Fifth Avenue properties which, pursuant to the settlements, she conveyed to Richard and Theodore. Under section 2056(a), the Estate may claim, as a marital deduction, the value of property which passes or has passed from decedent to his surviving spouse. Respondent's regulations provide, however, that if the surviving spouse gives up her right to receive any portion of decedent's Estate pursuant to a "controversy *129 involving decedents's will, or involving any bequest or devise thereunder", the interest that she gives up is not considered as having passed from decedent to his surviving spouse. Sec. 20.2056(e)-2(d)(1), Estate Tax Regs. Petitioners argue that, in this case, Diana did not surrender property in any "controversy involving decedent's will or involving any bequest or devise thereunder". Petitioners make separate arguments as to Richard and Theodore. As to Richard, they contend that he did not challenge Diana's rights, either as to provisions for her in the will or as to her election to take against the will. Hence, there was no "controversy" within the meaning of the regulations. With respect to Theodore, petitioners urge that his will-contest suit lacked merit, and that the Estate should not be penalized for settling his vexatious litigation. We have held, however, that respondent's "will contest" regulation is to be read broadly. In Estate of Davenport v. Commissioner, 38 T.C. 670, 672-673 (1962), affd. sub. nom. United States Trust Co. v. Commissioner, 321 F.2d 908 (2d Cir. 1963), we said -- It is the best judgment *130 of this Court that the quoted regulation refers to any controversy, with relation to the decedent's disposition of his entire estate, settled by the widow giving up some part of the estate subject to United States estate tax which, but for the controversy, she would have been entitled to retain, and as thus interpreted the regulation is reasonable and carries out the intent of the law. * * *
Other cases are in accord. See, for example, Citizens & Southern National Bank v. United States, 451 F.2d 221 (5th Cir. 1971); Pastor v. United States, 386 F. Supp. 106 (E.D.N.Y. 1974). [8]
*131 In the cases of both Richard and Theodore, Diana's election to take her statutory share obviously created a controversy. Decedent had bequeathed to Richard the Parsons Avenue property and to Theodore the Woodland Avenue and East Fifth Avenue properties. Diana, by her election, took one-third of each property. The disputes with Richard and Theodore directly involved a will controversy and thus came within the express language of the regulation. By the same token, these controversies existed "with relation to the decedent's disposition of his entire estate". Estate of Davenport v. Commissioner, supra at 672. Diana settled the controversies by giving up her interest in the Parsons Avenue property, the Woodland Avenue property, and the East Fifth Avenue property. These properties, as part of decedent's Estate, were plainly subject to Federal estate tax under section 2033. Finally, there is no argument that, but for the controversies, she would have been able to retain those properties. Under these circumstances, respondent's regulations apply, and the Estate is not allowed a marital deduction that includes her interest in the three properties *132 that Diana ceded to decedent's sons. Id. Issue 3. Determination of Estate Tax Liability
The next issue pertains to the determination of liabilities for the taxes and additions to tax among decedent's beneficiaries. Respondent seeks to enforce liability for the asserted deficiencies and additions against Diana both as a fiduciary and as a transferee. Respondent also seeks to enforce liability as a transferee against Richard and the Trust. Section 6901(a) sets forth a collection procedure to be used by respondent to collect income, estate, and gift tax liabilities from fiduciaries and transferees. Under section 6901(a) this Court may determine the liability of transferees of a decedent's property and the liability of the fiduciaries who administer that property. Before the enactment of section 6901 and its predecessors, respondent was required to bring a case under State procedures to collect liabilities from parties other than the actual taxpayer. This procedure proved too cumbersome, however, in comparison with the summary administrative remedy allowed against the taxpayer itself. Congress therefore provided a remedy, which is now set forth in section 6901. Commissioner v. Stern, 357 U.S. 39, 41-45 (1958). *133 Section 6901 does not establish or define a transferee's or fiduciary's substantive liability. The existence and extent of substantive liability as a transferee or fiduciary is determined under other provisions of Federal law or State law or equity. Commissioner v. Stern, supra; Gumm v. Commissioner, 93 T.C. 475, 485 (1989), affd. per order, 933 F.2d 1014 (9th Cir. 1991); Hamar v. Commissioner, 42 T.C. 867, 873 (1964). Respondent has asserted that Diana is personally liable for estate tax deficiencies as a fiduciary under 31 U.S.C. section 3713(b) (1988). That section provides -- A representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.
"Courts have departed from a literal interpretation of this statute in holding that a fiduciary may be liable for a distribution of funds that is not, strictly speaking, the payment of a debt. *134 * * * However, it has long been held that a fiduciary is liable only if it had notice of the claim of the United States before making the distribution". Want v. Commissioner, 280 F.2d 777, 783 (2d Cir. 1960), affg. 29 T.C. 1223 (1958). The issue as to notice is whether the executor knew or was chargeable with knowledge of the debt -- that is, whether the executor was in possession of such facts as to "put him on inquiry". New v. Commissioner, 48 T.C. 671, 676 (1967). Diana has the burden of proving that she had no liability under 31 U.S.C. section 3713(b). McCourt v. Commissioner, 15 T.C. 734 (1950). The facts in this case, however, establish her liability. In December of 1985, Diana received a letter from the Estate's law firm indicating that the value of the estate "may be undertaxed". Respondent sent a letter to the Estate in December of 1986, advising that respondent had begun an examination of the Estate's tax liabilities. We think that the foregoing is sufficient to have put Diana, as executor, on inquiry as to *135 respondent's claims before she made distribution of the Estate's assets to the beneficiaries in 1987. It is thus proper to charge Diana with notice of those claims. See Viles v. Commissioner, 233 F.2d 376 (6th Cir. 1956), affg. T.C. Memo. 1955-142. Diana argues that, before she distributed the assets of the Estate, she made adequate provision for the payment of taxes. She points to the settlement agreement's provision that the Trust, to which she distributed $ 475,000, would assume liability for the estate taxes. We have found no cases, however, and petitioners have cited none, for the proposition that making a provision for the payment of taxes from assets already distributed is a defense to imposition of liability under 31 U.S.C. section 3713(b). The fact that she had arranged a source for the payment of previously unpaid taxes does not affect her initial liability, as the executor, for those taxes. Respondent has also borne the burden of proving that Diana is liable as a transferee of decedent's property. Much of Diana's transferee liability in respect to the unpaid estate tax *136 is based upon section 6324(a)(2), which imposes a direct liability for such tax upon a surviving spouse, independent of the operation of State law. [9]Schuster v. Commissioner, 312 F.2d 311 (9th Cir. 1962), affg. on this issue 32 T.C. 998 (1959); Estate of Whittle v. Commissioner, 97 T.C. 362, 367 (1991); Groetzinger v. Commissioner, 69 T.C. 309, 314 (1977). Section 6324(a)(2) imposes direct liability upon Diana with respect to property that she received that was also included in decedent's gross estate under sections 2034 through 2042. Such property includes jointly held property and insurance policies. *137 We are not prepared to say, however, that Diana has incurred direct liability under section 6324(a) with respect to the property she received as a result of the settlement agreements with Richard and Theodore. Such property would include the house trailer, the bulldozer, the $ 10,000 she received in lieu of her claims against the Trust, and, briefly, her one-third interest in the real estate that she ceded to Richard and Theodore. Section 6324(a)(2) imposes direct liability for property that was included in the gross estate under sections 2034 through 2042. It does not appear that any of the property Diana took as a result of the settlement agreements was included in decedent's gross estate by operation of sections 2034 through 2042. Therefore, section 6324(a)(2) does not apply to impose direct liability upon Diana with respect to the value of that property. Respondent, however, has also borne the burden of proving that, under Ohio law, Diana, like Richard and the Trust, are all liable as transferees. Section 6902(a); Rule 142(d). Ohio Rev. Code Ann. sec. 2113.53 (Anderson Supp. 1991) provides: "Each beneficiary or heir is liable to return the assets, or the proceeds from *138 the assets, if they are necessary to satisfy * * * any claims against the estate." In Hamar v. Commissioner, 42 T.C. at 873-874, we examined the provisions of the Ohio Revised Code that address the existence and extent of transferee liability. These provisions, substantially unchanged, are still in effect. In Hamar we said: It will be observed that under these Ohio statutes, legatees and other distributees of a decedent's estate become severally liable as transferees, for the estate's obligations to creditors (which would include obligations to the United States for taxes) in situations where the estate itself is unable to satisfy such preferred obligations by reason of distributions from the estate assets having been paid to such legatees or other distributees before payment of debts and obligations which were entitled to priority in the disposition of the estate assets.
Petitioners argue that Diana's liability for the property she received is limited by provisions of the Ohio Revised Code relating to allocations of estate taxes. Specifically, they point to Ohio Rev. Code Ann. section 2113.86(C)(1) (Anderson Supp. 1991) and urge *139 that "Estate tax is not apportioned to property or to an interest in property for which an estate tax marital deduction is allowable". Petitioners ignore the fact that this statute relates to assets before distribution. The provision that is relevant here is Ohio Rev. Code. Ann. section 2117.41 (Anderson 1990), which imposes liability upon the "heirs, next of kin, surviving spouse as next of kin, devisees, and legatees under decedent's will, each of whom shall be liable to the claimant in an amount not exceeding the value of the real and personal estate that he received under the will or on distribution of the estate." (Emphasis supplied.) Under this provision of Ohio law, Diana became liable as a transferee with respect to the value of the property she received on distribution of the Estate. Hamar v. Commissioner, supra.
Petitioners similarly urge that Richard is liable only for that portion of the total taxes and additions to tax at issue here that corresponds to the ratio that his share of the Estate's assets bears to the total of the Estate's assets. Petitioners urge that he can be held liable for more than that portion only if *140 another distributee's share is uncollectible. Petitioners' argument is based upon Ohio Rev. Code Ann. section 2117.42 (Anderson 1990), a procedural statute [10] that, as they seek to apply it here, might require respondent, in collecting the revenue, to assemble the Estate's assets and address the rights of the various claimants. State law is not controlling, however, with respect to the procedures applicable to respondent's assessment and collection of the transferee liability. With respect to collecting Federal taxes from transferees, the procedures established by section 6901 supersede those of the various States, including those which might be read to require a claimant to marshal the assets of an estate and *141 adjust the rights of the various beneficiaries. Phillips v. Commissioner, 283 U.S. 589, 604 (1931); see Phillips-Jones Corp. v. Parmley, 302 U.S. 233, 237 (1937); Hamar v. Commissioner, supra.Section 6901 thus supersedes section Ohio Rev. Code Ann. section 2117.42 with respect to collecting Federal taxes from transferees. As the Supreme Court said in Phillips v. Commissioner, supra at 604, respondent is not limited by such State law requirements: "There is nothing * * * to indicate that Congress intended to limit the procedure in this way. And any such requirement would seriously impair the efficiency of the summary method provided." See 5 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 137.7.1, at 137-30 (2d ed. 1993). We accordingly hold that Diana, Richard, and the Trust are liable as transferees under Ohio law for the taxes and additions to tax that are owing as a result of the decision in this action, to the extent of the value of the property received from decedent's Estate. Hamar v. Commissioner, supra. *142 As noted above, Diana is also liable under section 6234(a) and 31 U.S.C. section 3713(b). In view of the foregoing, and to give effect to concessions, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners additionally contend that, while decedent's attempts to transfer the stock were not effective for tax law purposes, the transfers may have been effective for State law purposes. They cite Ohio Rev. Code Ann. secs. 1308.23(A)↩ (Anderson Supp. 1991) (formerly sec. 1308.19(A) (Anderson 1979)) and 1701.28(B)(2) (Anderson 1992), plus several Ohio cases. Because the parties have agreed to the Federal estate tax liabilities arising from the transfers (subject to our decision herein), we need not decide the separate issue of the transfers' validity under State law.
3. Respondent urges that Ms. Sanders' signature, as it appears on some HCD corporate minutes that were allegedly executed in 1985, resembles her signature as it appeared on Certificate Nos. 1 and 2. When she was shown the corporate minutes, however, Ms. Sanders could not state when she had signed them.↩
4. We note that the printed form upon which Certificate No. 2 appears is different from that used for the other certificates, including Certificate No. 1 originally issued in 1981, and the replacement certificates prepared in 1985. On Certificate No. 2 a small line of type identifying the printer is set in capitals and lower case, while the same line on the other certificates is in all capitals. Moreover, unlike the other shares, Certificate No. 2 does not bear on its reverse side the legend "Issued Without Par Value ". The most likely explanation is that, when he decided to prepare certificates transferring stock to Richard and Cynthia, decedent took a blank certificate from one of his other corporate form books. That explanation, however, does not help in establishing when the certificate was executed. The original Certificate No. 3 apparently has been lost.↩
5. When decedent was in the hospital, he told Mr. Jones that the HCD stock should be given to Richard and Cynthia. It is likely that decedent then only had reference to delivery of the stock certificates. Decedent may have assumed that, in other respects, he had already transferred the stock to Richard and Cynthia by making entries upon the corporate stock journal and the stock certificates. We note again that, while he was in the hospital, decedent told Cynthia that she "had" the HCD stock.↩
6. Nor has respondent shown the basis upon which decedent believed that backdating gifts of stock would save estate and gift taxes. HCD's books were in a chaotic condition. Respondent's examination report itself states "Valuation of the gifted shares is extremely difficult because of the inaccuracies and deficiencies in the accounting and financial records for the corporation." We realize that decedent's balance sheets show that his HCD stock was worth $ 112,596.41 on June 30, 1981, that it went down to $ 100,000 on June 30, 1982, and up to $ 210,844 in January 1, 1984. We believe, however, that decedent was only aware that the actual value of HCD fluctuated, and thus that he did not know the value of the corporation at any given time. Again, we note that the HCD stock was not a major component of his holdings.↩
7. In a further attempt to establish fraud, respondent has made a number of allegations concerning differences between Mr. Jones' testimony at a will-contest proceeding and his testimony in the present case. We have reviewed the alleged differences. To the extent any may be said to exist, we do not find them to be significant.↩
8. Two cases have refused to apply sec. 20.2056(e)-2(d)(1), Estate Tax Regs., as broadly as those cited above might suggest. See Schroeder v. United States, 924 F.2d 1547 (10th Cir. 1991) and Estate of Ransburg v. United States, 800 F. Supp. 716 (S.D. Ind. 1991). In Schroeder, the court indicated that the regulation applies to probate assets in a will contest but not to controversies involving intestate succession. Each of those cases held, however, that, while the subject regulations did not apply, the property interests ceded by the surviving spouse did not "pass" to her from decedent's estate under the statutory provisions of sec. 2056. Accordingly, the value of those interests could not form part of the marital deduction. Both Schroeder and Estate of Ransburg specifically rejected the reasoning of First National Bank v. United States, 233 F. Supp. 19 (D. Kan. 1964), a case upon which petitioners rely. First National Bank had held that property taken by will, intestacy, or statutory election vested immediately in the surviving spouse, with the result that such property must have "passed" to her under the provisions of sec. 2056. Because appeals from judgments of the court that decided First National Bank would be taken to the Court of Appeals for the Tenth Circuit, which decided Schroeder, we doubt that First National Bank↩ has much continued validity.
9. Sec. 6324(a)(2) reads in pertinent part as follows: (2) LIABILITY OF TRANSFEREES AND OTHERS. -- If the estate tax imposed by chapter 11 is not paid when due, then the spouse, transferee, trustee (except the trustee of an employees' trust which meets the requirements of section 401(A)), surviving tenant, person in possession of the property by reason of the exercise, nonexercise, or release of a power of appointment, or beneficiary, who receives, or has on the date of decedent's death, property included in the gross estate under sections 2034 to 2042, inclusive, to the extent of the value, at the time of decedent's death, of such property, shall be personally liable for such tax. * * *↩
10. The procedural nature of Ohio Rev. Code. Ann. sec. 2117.42↩ (Anderson 1990) is reflected in its language which, while providing for the joining of all transferees in one action, states "No suit shall be dismissed or debarred for not making all the persons defendants who might have been included as such."