**Burnett SCHWARTZ and Estate of Max L. Raskin, Deceased, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 76–1408.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1977.

Decided July 13, 1977.

312

Robert J. Domrese, St. Louis, Mo., for appellant; Carroll J. Donohue, St. Louis, Mo., on brief.

Karl Schmeidler, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellee; Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Crombie J. D. Garrett and David E. Carmack, Attys., Washington, D. C., on brief.

Before HEANEY and STEPHENSON, Circuit Judges, and STUART, District Judge.*

HEANEY, Circuit Judge.

This appeal is from a decision of the Tax Court holding the petitioners, executors of the estate of Sam Melman, Jr., personally liable for estate taxes owed by the decedent's estate. We reverse and remand for the reasons stated in this opinion.

Sam Melman died in November, 1967. His son, Gene J. Melman, and the petitioners, Burnett Schwartz and Max L. Raskin, were appointed executors without bond of his estate.[1] The estate tax liability of the Melman estate was stipulated to be $29,820, plus a penalty of $1,491 and interest. Nei-

1. Gene J. Melman is not a party to this action. Max L. Raskin died on September 8, 1971, and this action was brought against his estate.

ther the estate nor the executors have made payments on the liability.[2]

The principal assets of the estate were the decedent's interest in two businesses, the Duro Chrome Corporation and the Melman Fixture Company, which the decedent owned and operated during his lifetime. The value of these assets is the subject of dispute. The largest asset was 2,263 shares of common stock of Duro Chrome, representing seventy-one percent of the corporation's outstanding shares. The Tax Court found that the Duro Chrome stock had a value of $400,000 at the time of the decedent's death. In 1968, Duro Chrome showed a before-tax profit of over $100,000. It showed before-tax losses of $137,163 in 1969, $519,437 in 1970 and $125,217 in the first quarter of 1971. On August 17, 1971, Duro Chrome made a common law assignment for the benefit of creditors. At that time, the stock of Duro Chrome was valueless.

The other principal asset of the estate was the decedent's interest in the Melman Fixture Company. This consisted of fifty-eight percent of its outstanding stock and a receivable from Melman Fixture valued for estate tax purposes at $114,182. The Tax Court found the stock in Melman Fixture to be valueless because the company had shown losses for several years prior to the decedent's death and because it was dependent on the decedent's personal services. The receivable, however, was not valueless because Melman Fixture owned real estate in downtown St. Louis which the St. Louis Redevelopment Authority was expected to acquire. The real estate was sold by the court appointed administrator in October, 1972, to a private party for $65,000. Eight months later, it was sold to the Redevelopment Authority for $140,500. The estate also held other miscellaneous assets valued at approximately $32,800.

The Tax Court found that the principal liabilities of the estate consisted of a debt due Duro Chrome in the amount of $214,-336, a debt due Florence Melman, the decedent's widow, in the amount of $110,545; the estate tax liability in the amount of $31,311; a guarantee of a pledge of collateral to secure an indebtedness of Melman Fixture in the amount of $75,000; executors' fees due Schwartz and Raskin in the amount of $26,000; and a $17,968 balance due on a note secured by a mortgage on property owned by the decedent but conveyed to a third party before his death. The petitioners dispute the inclusion of the latter three debts as liabilities of the estate. The inclusion of other miscellaneous debts totaling $65,490 is not disputed.

The only significant distributions made during the administration of the estate were payments to Philip Melman, the decedent's brother, and to Florence Melman, the decedent's widow. The distributions to Florence Melman were made pursuant to the settlement of a probate dispute which had arisen when, contrary to an antenuptial agreement, Florence Melman claimed a one-third interest in the estate under Mo.Rev. Stat. § 474.160. On September 16, 1969, the Probate Court of the City of St. Louis approved a settlement agreement under which Florence Melman would receive a total cash payment in the amount of $108,000 and a Lincoln automobile valued at $2,545.[3]

The settlement called for the distribution of the car, an immediate cash payment of $50,000, twenty-nine monthly payments of $1,000 and a final payment of $29,000 at the end of twenty-nine months. At the time of the settlement, the estate had little, if any,

---

2. The United States has, however, recovered $17,000 from the foreclosure of a federal estate tax lien on property transferred by the estate to Gene J. Melman, as the guardian of Geri Gussie Melman. *United States v. Melman,* 398 F.Supp. 87 (E.D.Mo.1975), *affirmed,* 530 F.2d 790 (8th Cir. 1976). The amount for which the petitioners may be held liable is, thus, abated by that amount.

3. Under the settlement, Florence Melman was to receive an allowance for exempt property as a surviving spouse under Mo.Rev.Stat. § 474.-250; a family allowance of $25,000 under Mo. Rev.Stat. § 474.260; a homestead allowance of $7,500 under Mo.Rev.Stat. § 474.290(1); and a payment of $75,000, plus a Lincoln automobile valued at $2,545 in satisfaction of her claim to elect against the will.

cash. However, Melman Fixture had $50,-000 in an account at the First National Bank of St. Louis. The Bank released this amount only after the executors pledged the estate's Duro Chrome stock as collateral for the $75,000 owed the Bank by Melman Fixture. Florence Melman actually received only the automobile and cash payments of $72,000.

The following distributions of assets from the estate were made after September 16, 1969, the date the settlement with Florence Melman was approved by the Probate Court:

| Distributee | Date | Amount | Purpose |
|---|---|---|---|
| Philip Melman, Brother of Deceased | 9–26–69 | $ 1,000 | Payment of debt owned by decedent |
| | 9–29–69 | $ 500 | |
| Florence Melman, Wife of Deceased | 9–29–69 | $25,000 | Family allowance |
| | | $ 7,500 | Homestead allowance |
| | | $17,500 | Distribution to an heir |
| | 9–30–69 | $ 2,545 | Value of Lincoln automobile representing a distribution to an heir |
| | 10–16–69 thru 7–16–71 | $ 1,000 per month | Distribution to an heir (22 monthly payments were made) |
| TOTAL | | $76,045 | |

It is undisputed that the estate was insolvent at the time the payments were discontinued on July, 1971.

 Executors who pay debts to third parties before debts due the United States when the estate is insolvent, may be held personally liable under §§ 3466 [4] and 3467 [5] of the Revised Statutes, 31 U.S.C. §§ 191 and 192, for the amount owed by the estate to the United States.[6] In this case, the Tax Court found that the estate was insolvent as of September 16, 1969, and held that the petitioners were, therefore, liable for estate taxes in an amount equal to a series of payments made after that date to the brother and the widow of the decedent.[7]

**4.** The priority of debts due the United States is established by § 3466 of the Revised Statutes, which provides that "whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied." 31 U.S.C. § 191.

**5.** Personal liability of the executor is imposed by § 3467 of the Revised Statutes, which provides:

Every executor * * * who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debt so due to the United States, or for so much thereof as may remain due and unpaid. 31 U.S.C. § 192.

**6.** The forerunner of § 3466 was passed in 1797, and the forerunner of § 3467 was passed two years later in 1799. *See King v. United States,* 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964); *Price v. United States,* 269 U.S. 492, 46 S.Ct. 180, 70 L.Ed. 373 (1926). The statutes "evince Congress's early design to assure that debts due the United States from an insolvent estate should be preferred over other debts, enforcing this priority by holding the fiduciary personally accountable for any diminution in the available assets caused by his payment of other claims out of turn." Ferguson, *The Fiduciary's Personal Liability for Federal Taxes of the Decedent and His Estate: The Problems of Distribution and Partial Distribution,* 25 N.Y.U. Inst. on Fed.Tax. 1185, 1187 (1967). *See also* Alexander, *Personal Liability of Executors and Trustees For Federal Income, Estate, and Gift Taxes,* 9 Tax L.Rev. 1 (1953); Miller, *The Fiduciary's Personal Liability for Deficiencies in Federal Income, Estate and Gift Taxes of a Decedent or Decedent's Estate,* 11 Gonzaga L.Rev. 431 (1976).

**7.** The Tax Court recognized that widow's and family's allowances permitted by a state probate court are not "debts" within §§ 3466 and 3467. *See Grace McKnight,* 15 T.C. 730 (1950);

Alternatively, the Tax Court held that, even if the estate was initially solvent, it was deemed to have been insolvent during the period when these payments were made because at least some of the payments were made after the estate became insolvent. We disagree with both of these conclusions of the Tax Court.

## I.

■ The Tax Court found that the estate's financial position as of September 16, 1969, was as follows:

ASSETS

| | |
|---|---|
| Duro Chrome Stock (71% of all outstanding shares) | $250,000.00 |
| Melman Fixture Receivable | $115,000.00 |
| Miscellaneous Assets | $ 32,800.13 |
| | $397,800.13 |

LIABILITIES

*Notes and Accounts Payable*

| | |
|---|---|
| Duro Chrome | $214,336.05 |
| Florence Melman | $110,545.00 |
| Philip Melman | $ 6,000.00 |
| First National Bank of St. Louis (Duro Chrome stock pledged as security) | $ 75,000.00 |
| First National Bank of East St. Louis | $ 17,968.03 |
| Executors' Fees due Schwartz and Raskin | $ 26,000.00 |
| Miscellaneous | $ 65,490.11 |
| | $515,339.19 |

Based on the above balance sheet, the Tax Court found that the estate was insolvent at the time the executors made all the above listed distributions to Philip Melman and to Florence Melman. This finding is one of fact, *Kaufman v. Tredway*, 195 U.S.

271, 273, 25 S.Ct. 33, 49 L.Ed. 190 (1904), and is reversible only if it is clearly erroneous. *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); *American National Bank & Trust Co. of Chicago, Ill. v. Bone*, 333 F.2d 984, 986 (8th Cir. 1964). The principal issue raised on appeal is whether the Tax Court erred in valuing the Duro Chrome stock at $250,000 as of September 16, 1969. After a careful review of the record, we conclude that the valuation of $250,000 is not supported by the record and, indeed, is inconsistent with other factual findings of the Tax Court.

■ We recognize that the proper valuation of the Duro Chrome stock is basically a question of judgment requiring the consideration of a number of factors. *See Hamm v. C. I. R.*, 325 F.2d 934, 938 (8th Cir. 1963), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Among the factors to be considered are the value of the corporation's assets, its earnings and loss record, its management, its financial condition, its balance sheet and book value, and any other factor that an informed purchaser and an informed seller would consider in a sales transaction. *Riss v. C. I. R.*, 478 F.2d 1160, 1164 (8th Cir. 1973), *affirming*, 56 T.C. 388 (1971); *Hamm v. C. I. R.*, supra at 938–939; *Arc Realty Co. v. C. I. R.*, 295 F.2d 98, 102–103 (8th Cir. 1961); *O'Malley v. Ames*, 197 F.2d 256, 257–258 (8th Cir. 1952).

■ The Tax Court did not explain its $250,000 valuation of the estate's Duro Chrome stock.[8] The Commissioner lists sev-

*Jessie Smith, Executrix,* 24 B.T.A. 807 (1931); Ferguson, *supra* at 25 N.Y.U. Inst. on Fed.Tax. 1203–1204. Thus, the Tax Court correctly held that the United States did not have priority over the $25,000 paid by the executors to Florence Melman as a family allowance. The Tax Court did not reach the issue of whether the $7,500 homestead allowance also had priority over a debt owed the United States. A recent commentator has noted that rationale for the priority accorded to widow's and family's allowances could be logically extended to homestead allowances as well. Miller, *supra* at 11 Gonzaga L.Rev. 444.

**8.** We recognize that under F.R.Civ.P. 52(a), the court is only required to "find the facts special-

ly and state separately its conclusions of law thereon." Nonetheless, it would have been helpful if the Tax Court had given its reasons for valuing the estate's Duro Chrome stock at $250,000. It was established in *Securities and Exchange Com. v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947), that an agency must give reasons for its action and must state the theory underlying its action with clarity. *See also* 5 U.S.C. § 557(c). As Kenneth Culp Davis has noted, "[o]ne might wish that not only agencies but courts could and would live up to the Supreme Court's statement of the ideal [in *Securities and Exchange Com. v. Chenery Corp.*]." 2 Davis, *Administrative Law Treatise*, § 16.12 at 483 [1958].

eral factors supporting a lower valuation of the stock in September, 1969, than at the time of the decedent's death in November, 1967, including inadequate management,[9] labor difficulties, a lack of working capital,[10] old and inefficient facilities,[11] Duro Chrome's losses in 1969, 1970 and 1971[12] and Duro Chrome's eventual assignment for the benefit of creditors in August, 1971. In our judgment, undue weight was given to post-September 16, 1969, occurrences in establishing the value of the stock on that date.[13]

A useful starting point for valuation of the Duro Chrome stock is the corporation's book value.[14] The audited financial statement of Duro Chrome for 1969[15] shows a year-end book value of $845,000. The estate's seventy-one percent share would, thus, be valued at about $600,000. A review of the record indicates that the stated year-end book value was excessive. Fixtures worth at least $25,000, belonging to the decedent's son and daughter, were incorrectly included as assets of Duro Chrome. The fixed assets, receivables and inventory were stated at an amount over twice that recovered upon liquidation two years later.[16] A receivable of $200,128 from

the estate of Sam Melman and a $110,000 receivable from Melman Fixture were also included in the year-end book value. The financial statement characterized these receivables as "doubtful" and indicated that the amount actually received would be dependent upon the amount realized on the condemnation of real estate owned by Melman Fixture in downtown St. Louis. While the receivables were considered to have no current value to Duro Chrome, they were not written off by the corporation until a year later—at the end of 1970. Even if the two doubtful receivables are eliminated entirely along with the $25,000 worth of fixtures incorrectly included as belonging to the corporation, the estate's seventy-one percent share would still be worth about $365,000—a valuation which is significantly higher than the $250,000 value set by the Tax Court.

An analysis of the profit-and-loss record for the two years after the decedent's death yields a similar valuation. The Tax Court found that the estate's Duro Chrome stock was worth approximately $400,000 as of the date of death, making the total valuation of Duro Chrome $563,380. If the 1968 after-

---

9. The decedent's death left the corporation without adequate management. Gene Melman, who assumed control after his father's death, lacked the needed managerial experience and ability. He suffered a nervous breakdown in August, 1970. At that time, Burnett Schwartz temporarily assumed managerial responsibilities at Duro Chrome. When he arrived at Duro Chrome, he found things to be in a very "chaotic" state.

10. By the end of 1969, the corporation was in technical default on a loan from Prudential, a major creditor, because of insufficient working capital. Foreclosure was avoided by an agreement worked out with Prudential by Burnett Schwartz.

11. Duro Chrome was obligated to lease old and inefficient facilities for fifteen years. This factor may well support a lower overall valuation for Duro Chrome, but it does not support a significantly lower valuation in 1969 than 1967 because Duro Chrome was similarly obligated at that time.

12. A review of the earnings record of Duro Chrome reveals a seasonal pattern, with a "slow" period during the months of December, January and February. Losses experienced

during the first quarter were traditionally made up later in the year.

13. Indeed, the fact that Duro Chrome did not cease operations until mid-1971 is an indication of continued faith in its ability to continue operations.

14. We do not, however, rely upon book value alone. Indeed, it would be an error to do so. *Ketler v. Commissioner of Internal Revenue,* 196 F.2d 822, 827 (7th Cir. 1952).

15. For the period in question, the financial statements of Duro Chrome were prepared by Albert Melman, the decedent's nephew, of Raskin, Melman and Raskin, Certified Public Accountants. Despite the family relationship, we know of no reason to seriously question the accuracy of these statements.

16. We do not mean to imply that the values received as a result of the forced liquidation necessarily reflect the true value of the assets. It is an indication, however, that the fixed assets, receivables and inventory may have been slightly overstated.

tax profit of $52,000 is added to Duro Chrome's retained earnings and the 1969 after-tax loss of $79,000 is subtracted, then the net worth of Duro Chrome becomes $536,380.[17] The estate's share would be approximately $380,000.

■ Thus, the record does not support the Tax Court's finding that the Duro Chrome stock was worth only $250,000 as of September 16, 1969. If the Duro Chrome stock is valued at $365,000, then the estate would have been solvent on that date.

Moreover, in our judgment, the Tax Court overstated the liabilities of the estate. The Tax Court included a debt to Duro Chrome of $214,337 as a liability of the estate. The inclusion of the full value of the debt as a liability of the estate, and its apparent exclusion as an asset of Duro Chrome, tended to exaggerate the size of the estate's liabilities relative to its assets.

■ The petitioners also challenge the Tax Court's inclusion of the following liabilities in the decedent's estate: the $75,000 debt due the First National Bank in St. Louis and the $17,968 debt due the First National Bank of East St. Louis. While each of the above debts are properly included as liabilities of the estate as of September 19, 1969, we question their inclusion at face value. It is well settled that the obligation of a third party, which the estate has agreed to pay or has given collateral for, is a liability of the estate with any right of contribution from the third party representing an asset of the estate. *Huttig Mfg. Co. v. Edwards,* 160 F. 619, 621 (8th Cir. 1908); *Wingert v. President, Directors and Co. of Hagerstown Bank,* 41 F.2d 660, 662 (4th Cir. 1930). The $75,000 debt due the First National Bank in St. Louis is a liability of the estate because the note was cosigned by the decedent and Melman Fixture and because the executors pledged the estate's Duro Chrome stock as collateral for the note. The Tax Court erred in not attributing any value to the estate's right of contribution

against Melman Fixture since Melman Fixture made partial payments on the note, reducing the balance due to $42,000 as of 1971. The Tax Court similarly erred in failing to attribute any value to the right of contribution on the $17,968 debt due the First National Bank of East St. Louis. The decedent had given the Bank a note in that amount to secure a loan for the purchase of property subsequently conveyed to a third party. Since it was stipulated that the third party had made payments on the note since the conveyance, the right of contribution was of some value and should have been included as an asset of the estate.

■ Finally, the petitioners challenge the inclusion of $26,000 in executors' fees as a liability of the estate. The claim for $26,000 in executors' fees was not submitted until 1971, and covered services provided from the date of decedent's death in 1967 until the petitioners' resignation as executors in 1971. At least a portion of the claim was for services performed after September 16, 1969. Thus, the entire claim should not have been included as a liability of the estate on that date.

■ We conclude, therefore, that the Tax Court both understated the amount of the estate's assets and overstated the amount of its liabilities as of September 16, 1969. Viewing the evidence in the light most favorable to the government, and including the disputed liabilities at face value, the estate's financial position as of September 16, 1969, was as follows:

### ASSETS

| | |
|---|---|
| Duro Chrome Stock (71% of all outstanding shares) | $365,000 |
| Melman Fixture Receivable | $115,000 |
| Miscellaneous Assets | $ 33,000 |
| | $513,000 |

### LIABILITIES

*Notes and Accounts Payable*

| | |
|---|---|
| Florence Melman | $110,000 |
| Philip Melman | $ 6,000 |
| First National Bank of St. Louis (Duro Chrome stock pledge as security) | $ 75,000 |

---

**17.** This valuation may well be low for two reasons. First, since the valuation of $400,000 was as of the date of death in November 1, 1967, it does not include two months of activity at the end of 1967. Second, the losses for all of 1969 were subtracted including those for the three and one-half month period after September 16, 1969.

LIABILITIES—Continued

*Notes and Accounts Payable*—Continued

| | |
|---|---|
| First National Bank of East St. Louis | $ 18,000 |
| Executors' Fees due Schwartz and Raskin | $ 26,000 |
| Miscellaneous | $ 65,000 |
| | $300,000 |

If the assets and liabilities had been correctly valued, the estate would have been solvent on that date.

■ It is clear from the record, however, that the estate did become insolvent by the end of 1970. As previously indicated, the net worth of Duro Chrome was about $500,000 at the end of 1969. Thus, when Duro Chrome lost over $519,000 in 1970, its stock became worthless. Since Duro Chrome stock was the estate's principal asset, the estate became insolvent at some time during 1970. Moreover, by that time, the petitioners were aware, or should have been aware, of the financial status of the estate.[18] The losses suffered by Duro Chrome in 1969, 1970 and the first quarter of 1971, clearly indicated a decline in value of the estate's principal asset. Burnett Schwartz was actively involved in the management of Duro Chrome and Max L. Raskin was frequently consulted. Indeed, Schwartz's offer to purchase Duro Chrome at the end of 1970 establishes that he felt that the stock of Duro Chrome had little value at that time. The offer provided that the estate would receive payment for the stock only if Duro Chrome made a profit in the future.

18. Sections 3466 and 3467 of the Revised Statutes apply when the estate "is insufficient to pay all the debts due from the deceased." 31 U.S.C. §§ 191 and 192. The statutes apply even if the estate was solvent at the time of death but subsequently becomes insolvent. *Alexander, supra* at 9 Tax L.Rev. 6–7; *Miller, supra* at 11 Gonzaga L.Rev. 436; Plumb, *The Federal Priority in Insolvency: Proposals for Reform,* 70 Mich.L.Rev. 1, 25 (1971). In the case of living debtors, the Supreme Court has interpreted § 3466 to require an overt act of insolvency of the mode listed in the second clause of the section. *United States v. Oklahoma,* 261 U.S. 253, 260, 43 S.Ct. 295, 67 L.Ed. 638 (1923). In *Bramwell v. United States Fidelity & G. Co.,* 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368 (1926), the Supreme Court stated

■ Since it appears clear from the record that the estate became insolvent by the end of 1970, and that distributions were made after that time, we remand the case to the Tax Court. The Tax Court shall determine when the estate became insolvent and the petitioners shall be held liable for any distributions made after that time.[19]

II.

■ The Tax Court held in the alternative that the insolvency occurring by the end of 1970 should be imputed back throughout the entire series of distributions to Florence Melman. The cases cited by the Tax Court for this proposition all involve the imposition of personal liability on transferees rather than upon executors. *Benoit v. Commissioner of Internal Revenue,* 238 F.2d 485 (1st Cir. 1956); *Borall v. Commissioner of Internal Rev.,* 167 F.2d 865 (2nd Cir. 1948); *Botz v. Helvering,* 134 F.2d 538 (8th Cir. 1943). The parties have not cited, and our research has not revealed, any cases in which the series distribution rule has been applied in cases of fiduciary rather than transferee liability. Instead, we have found two cases which have refused to impose personal liability under §§ 3466 and 3467 for making payments from a then-solvent estate which thereafter becomes insolvent. *United States v. Lutz,* 295 F.2d 736, 743 (5th Cir. 1961); *United States v. Giger,* 26 F.Supp. 624 (W.D.Ark. 1939).

that the federal priority applied "to all debts due from deceased debtors whenever their estates are insufficient to pay all creditors, and extends to all debts due from insolvent living debtors when their insolvency is shown in any of the ways stated in § 3466." *Id.* at 487–488, 46 S.Ct. at 177. This implies that the requirement of an overt act of insolvency has not been extended to the case of a decedent's estate. *See Ferguson, supra* at 25 N.Y.U. Inst. on Fed. Tax. 1195.

19. An analysis of the 1970 monthly or quarterly earnings statements of Duro Chrome would reveal at what point the value of the estate's stock had been so reduced as to render the state insolvent.

In *United States v. Lutz, supra,* the government was, in effect, seeking a retroactive priority. Lutz was the president and principal shareholder of a corporation which had been paid $35,897 to supply tomatoes to the United States. The tomatoes were destroyed in a warehouse fire before they were delivered, and Lutz received $100,000 in insurance proceeds. Lutz distributed the insurance proceeds to other creditors, believing he had a sufficient inventory to satisfy his debt to the United States. However, the market fell and he was unable to repay the United States. The Fifth Circuit remanded the case and found that Lutz could be held liable only if the corporation was insolvent when Lutz distributed the insurance proceeds. It rejected retroactive liability stating that:

> the Government's construction of the statute [§ 3466 of the Revised Statutes] would produce a far-reaching effect that we cannot believe was intended by Congress. It would subject corporate officers to the harsh rule that whenever they paid any debt at a time when the corporation owed money to the government, no matter how solvent the corporation, they would be personally liable should the corporation eventually be unable to repay the government debt.

*United States v. Lutz, supra* at 742.

The conclusion reached by the Fifth Circuit is supported by the language of § 3466, which imposes liability when an individual "*is* insolvent" and when an estate "*is* insufficient." 31 U.S.C. § 191 (emphasis added). The requirement of a finding of insolvency under § 3466 has been held to apply to § 3467 which establishes personal liability of executors. *King v. United States,* 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964). One commentator has noted:

> Were a finding of insolvency "at any time" all that section 3467 required, the threat of personal liability would cast a long and gloomy shadow over the administration of every estate. Assets sufficient to meet all debts may be distributed, depreciated, or lost. * * *

Fortunately, the statutory language does not seem to support such retroactive claims. Payments made prior to insolvency (and thus before the time the United States is entitled to priority of payment) afford no basis for fiduciary liability.

Ferguson, *The Fiduciary's Personal Liability for Federal Taxes of the Decedent and His Estate; The Problems of Distribution and Partial Distribution,* 25 N.Y.U. Inst. on Fed.Tax. 1185, 1197 (1967). *Accord,* Miller, *The Fiduciary's Personal Liability for Deficiencies in Federal Income, Estate and Gift Taxes of a Decedent or Decedent's Estate,* 11 Gonzaga L.Rev. 431, 437 (1976).

Given the severity of personal liability, we are reluctant to impose it unless the statutory requirements for liability are satisfied. Therefore, we hold that the petitioners can only be held personally liable for those distributions made after insolvency had occurred.

Accordingly, we reverse and remand this case to the Tax Court for proceedings not inconsistent with this opinion.