T.C. Memo. 2016-48

UNITED STATES TAX COURT

SCOTT SINGER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23277-13.                    Filed March 14, 2016.

<u>Scott Eisenmesser</u> and <u>Sarah B. Rebosa</u>, for petitioner.

<u>Shawna A. Early</u>, for respondent.

MEMORANDUM OPINION

NEGA, <u>Judge</u>:  Pursuant to a notice of fiduciary liability dated July 16,

2013, respondent determined that petitioner is liable as the fiduciary of the Estate

of Melvin Sacks (sometimes referred to as the Sacks estate or the estate) for

[*2] unpaid Federal estate tax of $422,694 owed by the estate.[1]  The sole issue for

decision is whether petitioner is liable as fiduciary of the Sacks estate pursuant to

31 U.S.C. sec. 3713(b) (2012) for unpaid Federal estate tax owed by the estate.

## Background

All of the facts in this case, which the parties submitted under Rule 122,

have been stipulated and are so found except as stated below.  Petitioner resided in

New York, New York, at the time he filed his petition.

## I.      Melvin Sacks' Life

Melvin Sacks was a partner in the Law Firm of Sacks and Sacks (firm) in

New York, New York.  Mr. Sacks' brother, Ira Sacks, was the only other partner

in the firm.  On June 1, 1977, Mr. Sacks and Ira Sacks entered into a partnership

agreement wherein they agreed that, upon the death of either partner, the surviving

partner could purchase the other's partnership interest for $100.  On November 18,

1987, they entered into another agreement wherein they agreed that the surviving

partner would pay designated beneficiaries the sum of $1,000 per week for the

remainder of the beneficiaries' lives.  In the event that Mr. Sacks predeceased his

brother, Ira Sacks was to make such payments to Lucille Atwell, also known as

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times.  All Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[*3] Diane Sacks, Mr. Sacks' longtime companion.  Mr. Sacks and Ira Sacks maintained a joint bank account for the partnership, which Ira Sacks received pursuant to a joint tenancy with rights of survivorship upon Mr. Sacks' death.  Additionally, Ira Sacks received assets from their closely held business.

At the time of his death Mr. Sacks was legally married to Alvia Sacks.  However, Mr. Sacks was estranged from Alvia, and they had been living separately for over 25 years.  Mr. Sacks and Ms. Atwell never married, but they resided together in a cooperative apartment at 200 East 78th Street, New York, New York.  At the time of Mr. Sacks' death, he maintained brokerage accounts (brokerage accounts) in his and Ms. Atwell's names as joint tenants with rights of survivorship.  Mr. Sacks solely funded the accounts, which were valued in excess of $2 million at the time of his death.  In addition, Mr. Sacks carried life insurance on his own life, with the policies payable at his death to Ms. Atwell.

Mr. Sacks also had a relationship with Joan Parker.  On July 24, 1990, Mr. Sacks and Ms. Parker purchased, as joint tenants with rights of survivorship, the residence at 214-57 33d Avenue, Bayside, New York (Bayside residence).  Mr. Sacks provided all of the $500,000 used to purchase the residence.

Mr. Sacks died on August 24, 1990.  At his death, Mr. Sacks had outstanding Federal income tax liabilities from various tax years throughout the

**[*4]** 1980s and 1990. A proof of claim (explained in further detail below) filed by respondent in 1993 reflects a total balance owing of $1,775,370 for tax years 1982, 1989, and 1990. An offer acceptance report, signed by respondent in 1996, reflects that Mr. Sacks owed Federal income tax totaling $4,023,213 for tax years 1980, 1982-86, and 1989-90.

II. Petitioner's Actions as Executor

A. Appointment as Executor and Filing of Estate Tax Return

Mr. Sacks' will named petitioner as his executor, and petitioner has continued to act as executor since being appointed preliminary executor on December 4, 1990. In relevant part, Mr. Sacks' will contained the following dispositive provisions: (1) to Alvia Sacks, an amount equal to the elective share to which she would be entitled under New York State law, to be held in trust, plus $10,000; (2) to Ms. Atwell, one-third of Mr. Sacks' estate plus their cooperative apartment, his automobile, his large boat, a mortgage held on a property in New Jersey, and his race horse or horses; (3) equally to Stuart and Stacey Solomowitz, Mr. Sacks' grandchildren, the residue of the estate upon their each reaching 35 years of age; and (4) to Ira Sacks, any interest held by Mr. Sacks in their joint law practice. The will made no provision for the payment of any Federal or State estate tax.

[*5]   On December 21, 1990, petitioner filed a petition in the Surrogate's Court of the State of New York (surrogate's court) to obtain a restraining order over assets in the brokerage accounts. Petitioner sought to restrain these assets since, at the time, it appeared that the testamentary estate would be insufficient to pay the claims of creditors, including Mr. Sacks' overdue Federal income tax and Federal estate tax. The value of the brokerage accounts was estimated in various filings with the surrogate's court to be in excess of $2 million. The surrogate's court issued an order to show cause on December 21, 1990, restraining the brokerage accounts. The assets in the brokerage accounts are still under the control of the surrogate's court.

On March 13, 1991, petitioner filed a petition in the surrogate's court to disaffirm the transfer of the Bayside residence to Ms. Parker. Petitioner stated therein that he sought to disaffirm the transfer for the benefit of the estate's creditors since the Sacks estate appeared to be insolvent.

Petitioner filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on behalf of the Sacks estate on November 25, 1991. On the Form 706, petitioner reported a gross estate of $3,933,637, a taxable estate of $3,208,103, and an estate tax liability of $1,011,279. No payments were submitted with the Form 706. On June 8, 1994, respondent issued to petitioner a

[*6] revenue agent's report proposing a deficiency of $831,313 relating to the estate tax liability. The estate agreed to the proposed deficiency on June 22, 1994. On July 1, 1994, respondent issued a Letter 627, Estate Tax Closing Letter, to petitioner. The closing letter determined that the estate owed estate tax of $1,842,592, plus interest and penalties.

B.     Contribution From Beneficiaries

At several points throughout petitioner's conduct as executor of the Sacks estate, he sought contribution toward the payment of the estate tax liability from those persons who had received property that was included in the gross estate for estate tax purposes. These beneficiaries include Ms. Parker, Ms. Atwell, Ira Sacks, and Mr. Sacks' daughter and son-in-law, Jane and Sheldon Solomowitz. Ms. Parker settled her proportionate contribution to the estate for $87,500, which was submitted to the IRS on November 7, 1997. Jane and Sheldon Solomowitz, who had received a gift from Mr. Sacks before his death that was includible in his gross estate for both Federal and State estate tax purposes, settled their proportionate contribution to the estate for $25,000 at a date which does not appear in the record.

**[\*7]** C.    Mr. Sacks' Income Tax Liabilities

On February 10, 1993, respondent filed a proof of claim (original proof of claim) in the surrogate's court with respect to Mr. Sacks' unpaid Federal income tax and the estate's Federal estate tax.  The original proof of claim reflects a balance due for unpaid income tax, penalties, and interest thereon of $1,775,370, and unpaid estate tax, penalties, and interest thereon of $1,221,902, totaling $2,997,272.

On December 29, 1994,[2] petitioner submitted an offer-in-compromise (OIC) of $1 million in satisfaction of all of Mr. Sacks' unpaid Federal income tax for tax years 1978 to 1990.  Respondent accepted the OIC on January 23, 1996. Petitioner submitted an undated petition to the surrogate's court requesting a limited release of the restraining order over the brokerage amounts to permit $1 million to be released to satisfy Mr. Sacks' unpaid Federal income tax liabilities. By order dated April 28, 1995, the surrogate's court ordered that the restraining order be lifted to permit withdrawal of $1,028,000 from the brokerage accounts, of

---

[2]The stipulation of facts incorrectly states the date of the offer-in-compromise as December 29, 1998.

[*8] which $1 million was to be remitted to the IRS and $28,000 to be paid to petitioner as an executor's commission.[3]

On February 5, 1999, respondent filed an amended proof of claim in the surrogate's court. The amended proof of claim specifically amends and supersedes the original proof of claim and does not reflect any balances owing for Mr. Sacks' unpaid Federal income tax. The amended proof of claim shows estate tax due, along with interest and penalties thereon, of $3,846,635.

Respondent argues that petitioner never made the $1 million payment in satisfaction of Mr. Sacks' income tax liabilities to the IRS, claiming that there is no documentary evidence in the record establishing that a payment was sent to the IRS in accordance with the terms of the OIC. For support, respondent cites a letter from petitioner's counsel in this case, Scott Eisenmesser, dated January 6, 1995. Mr. Eisenmesser's January 6, 1995, letter does not directly or indirectly make any mention of Mr. Sacks' unpaid Federal income tax liabilities or the OIC; it discusses only the estate's Federal estate tax liability. Respondent also cites Exhibit 46-J, which was intentionally omitted from the record, according to the

---

[3]The record reflects that petitioner requested the release of the restraining order before the acceptance of the OIC because he had been informally advised that the offer had been accepted and would be formally accepted shortly thereafter. Petitioner requested release of the restraining order so that he could make the $1 million payment within 30 days of the formal written acceptance of the OIC.

**[*9]** stipulation of facts.  We think there is documentary evidence in the record that supports petitioner's having paid Mr. Sacks' income tax liabilities in accordance with the terms of the OIC.  The amended proof of claim, filed in 1999 after the acceptance of the OIC in 1996, does not reflect any balances due for unpaid income tax.  Accordingly, in the absence of contradictory documentary evidence, we find that petitioner used the $1 million released from the brokerage accounts to fully pay Mr. Sacks' outstanding Federal income tax liabilities.

    D.    Distribution at Issue

Through a stipulation and order entered April 15, 1999, in the surrogate's court, petitioner made an application for the release of $753,321 from the brokerage accounts to enable the estate to pay (1) $251,107 to the Estate of Alvia Sacks, (2) $446,772 to the IRS, and (3) $171,587 to the New York Department of Taxation.  The payments to the Estate of Alvia Sacks and the New York Department of Taxation totaled $422,694 and formed the basis for respondent's assertion of liability against petitioner.  Respondent issued a notice of fiduciary liability to petitioner on July 16, 2013, that determined that petitioner was liable for the estate's unpaid estate tax of $422,694.

**[*10]**                              <u>Discussion</u>

I.      <u>Fiduciary Liability and the Federal Priority Statute</u>

In relevant part, 31 U.S.C. sec. 3713, often referred to as the Federal priority

statute, provides that when the estate of a deceased debtor, in the custody of the

executor or administrator, is not enough to pay all debts of the debtor, a claim of

the U.S. Government must be paid first. <u>Id.</u> subsec. (a)(1)(B). A representative of

a person or estate who pays any part of a debt of the person or estate before paying

a claim of the Government is liable to the extent of the payment for unpaid claims

of the Government. <u>Id.</u> subsec. (b).

Section 6901 provides for the assessment, payment, and collection of a

fiduciary's liability under 31 U.S.C. sec. 3713(b). <u>See</u> sec. 6901(a)(1)(B). The

term "fiduciary" includes an executor or any other person acting in a fiduciary

capacity. Sec. 7701(a)(6). Accordingly, the executor of an estate is personally

liable for the unpaid claims of the United States to the extent of a distribution from

the estate when (1) the executor distributed assets of the estate; (2) the estate was

insolvent at the time of the distribution or the distribution rendered the estate

insolvent; and (3) the executor had notice of the Government's claim. <u>See</u> 31

U.S.C. sec. 3713(b); <u>see, e.g.</u>, <u>United States v. Coppola</u>, 85 F.3d 1015, 1020 (2d

Cir. 1996); <u>Want v. Commissioner</u>, 280 F.2d 777, 783 (2d Cir. 1960) <u>rev'g in part</u>

**[*11]** 29 T.C. 1223 (1958); Leigh v. Commissioner, 72 T.C. 1105, 1109 (1979). Federal estate and income tax liabilities constitute a debt owed to the United States. See, e.g., United States v. Moore, 423 U.S. 77 (1975).

II.     Burden of Proof

Respondent and petitioner disagree as to who bears the burden of proof in this case, each contending that the other must prove the existence, or lack thereof, of the three elements of fiduciary liability. It is undisputed that in this case at least two of the elements are met: there was a distribution from the estate at a time that petitioner, as the executor, knew of taxes owing to the Government. However, whether the estate was insolvent at the time of the distribution at issue, or whether that distribution caused the estate to become insolvent, is less clear. If the estate was not insolvent at the time of the distribution, or if the distribution did not render the estate insolvent, the Government's claims are not entitled to priority and petitioner will not be liable as a fiduciary under 31 U.S.C. sec. 3713(b) and section 6901. See, e.g., United States v. Press Wireless, Inc., 187 F.2d 294 (2d Cir. 1951). After reviewing the caselaw, we are satisfied that respondent bears the burden of proof in this case.

In McCourt v. Commissioner, 15 T.C. 734 (1950), cited by respondent as support for his argument that petitioner bears the burden of proof, we stated:

**[*12]**      Petitioner's counsel further contend that <u>the burden being upon the respondent to establish a liability on the part of the petitioner,</u> such burden makes necessary that it be established that petitioner had knowledge at the time he made the aforesaid distributions that the indebtedness for taxes here in question existed.  In answer to this it need merely be said that knowledge upon the part of the fiduciary as to the existence of the liability to the Government is not a specific requirement under sections 3466 and 3467, Revised Statutes.  <u>Respondent's proof has clearly established the condition laid down by those statutes and has consequently made the prima facie showing required of him.</u> * * * [<u>Id.</u> at 737; emphasis added.]

Our interpretation is that <u>McCourt</u> speaks in terms of the burden resting with the Commissioner to prove a taxpayer's fiduciary liability.  <u>McCourt</u> does not elaborate why it confined the elements of fiduciary liability to the strict language of the predecessors of 31 U.S.C. sec. 3713, sections 3466 and 3467 of the Revised Statutes.  The language of these sections is substantively similar to the language of 31 U.S.C. sec. 3713, and importantly, neither 31 U.S.C. sec. 3713 nor its predecessors require knowledge on the part of the fiduciary in order for liability to attach although caselaw in this area clarifies that actual or constructive knowledge of the debt owed to the United States is a required element of fiduciary liability.  <u>See, e.g.</u>, <u>Little v. Commissioner</u>, 113 T.C. 474, 480 (1999); <u>Leigh v. Commissioner</u>, 72 T.C. at 1110.  In our reading, <u>McCourt</u> places the burden of proof on the Commissioner to establish that the statutory elements of 31 U.S.C. sec. 3713 have been met and, most importantly to the case at bar, that there have

**[\*13]** been a distribution when the estate was insolvent or that rendered the estate insolvent.

In Grieb v. Commissioner, 36 T.C. 156 (1961), we also placed the burden of proof on the Commissioner to establish fiduciary liability. The taxpayer in Grieb was the sole shareholder of a company that owed income tax and had received all of the assets of the company at a time when it was liable for that income tax. Id. at 163. The Court noted that under these facts the taxpayer could have been liable as a transferee rather than a fiduciary. Id. However, the Commissioner argued that the taxpayer should be held liable as a fiduciary, contending that he took all of the assets of the company under an express trust for the benefit of creditors. Id. The Commissioner conceded that he bore the burden of producing evidence in this respect. Id. The Court rejected the Commissioner's argument and, finding that the taxpayer was not a fiduciary within the meaning of the Federal priority statute, noted that the Commissioner had not put forth any evidence to show that the taxpayer had received company assets in any capacity other than as a stockholder. Id. at 168.

In Champlin v. Commissioner, 6 T.C. 280 (1946), the Commissioner argued that the administrator of the estate should be personally liable as a fiduciary for paying certain debts of the estate before paying the estate tax, including paying

**[\*14]** $2,183 in administrative expenses. Id. at 284-285. The Court recognized the principle that the Government's priority under the Federal priority statute is subject to claims for administration expenses authorized by any court having jurisdiction over the estate. Id. at 285. The Court stated that "respondent, who has the burden, has not shown that the payments in question were not approved by the appropriate court. Thus it follows that the petitioner is not personally liable for the sum of $2,183.35 paid out for expenses of administration." Id.

Although Memorandum Opinions of this Court are nonbinding precedent, see, e.g., Huffman v. Commissioner, 126 T.C. 322, 350 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008), in Allen v. Commissioner, T.C. Memo. 1999-385, the Court formulated the burden of proof quite clearly: "Accordingly, the personal representative of an estate is personally liable for the unpaid claims of the United States to the extent of the distribution, if the Government establishes the following: (1) The personal representative distributed assets of the estate; (2) the distribution rendered the estate insolvent; and (3) the distribution took place after the personal representative had notice of the Government's claim." (Emphasis added.)

[*15] The Supreme Court, in several old cases, took up the issue of who bears the burden of proof when the Federal priority statute is at issue.[4] In United States v. Hooe, 7 U.S. (3 Cranch) 73, 90 (1805), Chief Justice John Marshall wrote: "[I]t will be observed * * * that the insolvency, which is the foundation of the claim, must certainly be proved by the United States." In United States v. Howland & Allen, 17 U.S. (4 Wheat.) 108 (1819), Chief Justice Marshall again held that the burden of proving insolvency rested with the Government. The Court stated that the "onus probandi is thrown on the United States" to show that an assignment of property included all of the debtor's property, thereby rendering him insolvent within the meaning of the Federal priority statute. Id. at 116.

More recently, the Supreme Court considered the issue in United States v. Oklahoma, 261 U.S. 253 (1923). In that case, the Government used as proof of insolvency a statement from a State bank examiner that the debtor bank was insolvent. The Supreme Court found that this statement was insufficient to establish insolvency for purposes of the Federal priority statute because under Oklahoma law "insolvency" had a broader definition than what was contemplated

---

[4]The Federal priority statute has existed in some form since 1789. For a history of the statute, see United States v. Moore, 423 U.S. 77, 80-81 (1975) (noting that the versions enacted in 1797 and 1799 "have survived to this day essentially unchanged"), and King v. United States, 379 U.S. 329, 334-335 (1964).

**[*16]** by the Federal priority statute. Id. at 261. Although not explicitly stated, the implication in Oklahoma is that the Government bears the burden of proving insolvency.

Respondent cites Estate of Frost v. Commissioner, T.C. Memo. 1993-94, and Huddleston v. Commissioner, T.C. Memo. 1994-131, as establishing that petitioner bears the burden of proof in this case. We note that Estate of Frost and Huddleston were not decided on the burden of proof; in both cases, the facts were sufficient to establish the taxpayers' liability as fiduciaries.[5]

III.    Insolvency of the Sacks Estate

Two elements of fiduciary liability, knowledge of the tax owing and a distribution from the estate, are undoubtedly present in this case. The only contested element is the insolvency of the estate. Insolvency within the meaning of 31 U.S.C. sec. 3713 is defined as having liabilities in excess of assets. See Oklahoma, 261 U.S. at 260-261 ("Mere inability of the debtor to pay all his debts in ordinary course of business is not insolvency within the meaning of the act[.] * * * [T]he word 'insolvent' is used in different senses. Section 3466 makes it

---

[5]Although not binding precedent, we also take notice of the Internal Revenue Manual (IRM) pt. 5.17.14.4.3(3) (Jan. 24, 2012) which states: "To establish fiduciary liability under 31 U.S.C. sec. 3713(b), the Service has the burden to prove that the fiduciary paid a debt of the person or estate for whom the fiduciary is acting before paying the debts due the United States."

[*17] apply only in cases where the debtor * * * [does not have] sufficient property to pay all his debts.") (internal quotations omitted) (interpreting a predecessor statute of 31 U.S.C. sec. 3713); United States v. Press Wireless, Inc., 187 F.2d at 295-296 (interpreting United States v. Oklahoma, 261 U.S. 253 to mean that "insolvency always demands an insufficiency of assets").

Under New York law, with exceptions not applicable here, whenever a fiduciary has paid or may be required to pay Federal or State estate tax with respect to any property required to be included in the gross taxable estate, the amount of tax is to be equitably apportioned among the persons interested in the gross taxable estate.  N.Y. Est. Powers & Trust Law sec. 2-1.8(a) (McKinney 2012).  The amount of tax is apportioned among the persons benefited in the proportion that the value of the property or interest received by each such person benefited bears to the total value of the property and interest received by all persons benefited.  Id., subpara. (c)(1).  Thus, under New York law the Sacks estate was entitled to contribution towards its estate tax liability from those persons who received any property that was included in the gross estate, including nonprobate assets that were included by virtue of sections 2034-2042.  Specifically, those persons include:  (1) Ms. Atwell, who received the brokerage accounts as the surviving joint tenant in a joint tenancy with rights of survivorship,

[*18] see sec. 2040, and who received the proceeds of life insurance policies insuring Mr. Sacks' life, see sec. 2042; (2) Ms. Parker, who received the Bayside residence as the surviving tenant in a joint tenancy with rights of survivorship, see sec. 2040; (3) Ira Sacks, who received the proceeds of a bank account as the surviving joint tenant in a joint tenancy with rights of survivorship, see sec. 2040, and who received Mr. Sacks' interest in their closely held business; and (4) Jane and Sheldon Solomowitz, who received a gift from Mr. Sacks before his death that was included in his gross estate for Federal and State estate tax purposes.

In the Court of Appeals for the Second Circuit, to which an appeal in this case would lie, contingent subrogation and contribution rights must be valued as assets in determining solvency. In re Ollag Constr. Equip. Corp., 578 F.2d 904, 908 (2d Cir. 1978) (citing Updike v. Oakland Motor Car Co., 53 F.2d 369, 371 (2d Cir. 1931), Wingert v. President Dir. & Co. of Hagerstown Bank, 41 F.2d 660 (4th Cir. 1930), and Schwartz v. Commissioner, 560 F.2d 311, 317 (8th Cir. 1977), rev'g and remanding T.C. Memo. 1975-267). Accordingly, when calculating the estate's assets, it is appropriate to include the value of any contribution rights from Ms. Atwell, Ms. Parker, Ira Sacks, and Jane and Sheldon Solomowitz.

Respondent proffers as proof of the estate's insolvency statements from petitioner and third parties to the effect that the estate was insolvent at various

**[*19]** times between the opening of the estate on December 4, 1990, and the distribution at issue on April 15, 1999. We think these statements must be viewed in their proper context and, when so viewed, are not as damaging to petitioner as respondent argues. Just as the Supreme Court considered the State definition of "insolvency" in Oklahoma and concluded that statements by the State bank examiner that the bank was "insolvent" did not render the bank insolvent for purposes of the Federal priority statute, so too must we consider that statements by petitioner and third parties that the "estate" was insolvent likely referred only to the testamentary or probate estate. For example, in petitioner's actions to restrain the brokerage accounts, he specifically noted that "[t]he decedent's testamentary estate may be insufficient to pay the claims of creditors (including balances due the income tax authorities) and Federal and New York estate taxes." Similarly, in petitioner's petition to the surrogate's court to disaffirm the transfer of the Bayside residence to Ms. Parker, he stated: "Upon information and belief, the decedent's estate is insolvent; the assets of deceased, other than the assets for the recovery of which this action is brought, are insufficient to pay the debts of deceased." (Emphasis added.) When this statement is read in its proper context, it is clear to the Court that petitioner was referring only to the solvency of the probate estate. In fact the primary impetus for petitioner's actions against Ms. Atwell and Ms.

[*20] Parker seems to have been to secure assets under their control such that those assets would be available to pay the estate's tax liabilities.

Given that the Court of Appeals for the Second Circuit includes contribution rights when calculating solvency and that New York State law grants the estate such contribution rights from the aforementioned individuals, we are satisfied that the "estate" which must be valued for purposes of 31 U.S.C. sec. 3713(a)(1)(B) includes nonprobate assets, including contribution rights from various beneficiaries. Further, the relevant point at which to calculate the estate's solvency is the date of distribution, April 15, 1999. See, e.g., Schwartz v. Commissioner, 560 F.2d at 315; United States v. Lutz, 295 F.2d 736, 743 (5th Cir. 1961).

If we use April 15, 1999, the date of the distribution at issue, as the date for measuring the estate's solvency, the evidence does not show that the estate was insolvent within the meaning of 31 U.S.C. sec. 3713(a)(1)(B). Regarding probate assets, respondent argues that the estate tax liability of $1,842,592 exceeded probate assets that were valued at approximately $600,000 at the time of Mr. Sacks' death. Regarding probate and nonprobate assets, respondent argues that the estate and income tax liabilities of Mr. Sacks exceeded $7 million at the time

**[*21]** of Mr. Sacks' death, which greatly exceeded the taxable estate of $3,208,103 as reported on the Form 706.

Neither argument is persuasive for the following reasons. First, the solvency of the estate at Mr. Sacks' death is not relevant; the appropriate date for measuring the assets and liabilities of the estate is the date of distribution. Respondent has offered no evidence or calculations in this regard despite more than eight years' elapsing between Mr. Sacks' death and the distribution at issue. Second, as illustrated by In re Ollag Constr. Equip. Corp., 578 F.2d at 908, we take into consideration the nonprobate assets when calculating the estate's solvency. Third, at the time of the distribution, petitioner had already settled Mr. Sacks' unpaid Federal income tax liabilities for $1 million. In fact it appears that the only tax due to the Government at the time of the distribution was the unpaid estate tax. Accordingly, respondent's cited figures regarding the assets and liabilities of the probate and nonprobate estate are unpersuasive because: (1) we must value nonprobate assets, including contribution rights, in calculating the total assets and (2) any liability attributable to overdue income tax is incorrect, considering that Mr. Sacks' income tax liabilities had been settled for $1 million before the distribution at issue.

[*22] Respondent protests the inclusion of nonprobate assets when calculating the estate's solvency and argues that "there is no indication in the record that any payments were made by third parties." However, Ms. Parker's proportionate contribution toward the estate's tax liability was settled for $87,500, and this exact amount was remitted to the IRS on November 7, 1997. Additionally, Jane and Sheldon Solomowitz settled their proportionate contribution for $25,000 although it is unclear from the record whether these funds were paid over to the IRS. Thus, the contribution rights were of some value and should be included as assets of the estate. See Schwartz v. Commissioner, 560 F.2d at 317.[6]

Respondent also argues that petitioner cannot escape liability by entering into agreements with third parties to pay the estate tax liability. For support, respondent cites Coppola, 85 F.3d 1015. In that case, the executor of an estate had

---

[6]Beyond securing actual payments by third parties, petitioner took appropriate steps to ensure the security of the assets out of which contribution rights were to be paid, most significantly by restraining the brokerage accounts that were titled in Ms. Atwell's name. Ms. Atwell's liability for contribution rights is significant. Under N.Y. Est. Powers & Trust Law sec. 2-1.8(c)(1) (McKinney 2012), Ms. Atwell is liable for the amount of tax attributable to the value of the property she received in proportion to the total value of the property or interest received by all persons benefited. The brokerage accounts and proceeds of life insurance policies she received constituted more than 70% of the nonprobate assets. Given that the brokerage accounts are still under the control of the surrogate's court, it cannot be said that the contribution rights owing from Ms. Atwell are valueless.

[*23] stripped it of all of its assets by dividing the family businesses, which formed the bulk of the estate, among various family members. Id. at 1017. In exchange for receipt of the business interests, the recipients signed an agreement to pay any estate taxes due in proportion to the value of the assets they had received. Id. The Court of Appeals for the Second Circuit upheld the District Court's finding that the executor was personally liable despite the existence of the agreement purporting to apportion estate taxes among the beneficiaries of the distribution. Id. at 1020. Respondent also cites Estate of Frost v. Commissioner, T.C. Memo. 1993-94. In upholding the personal liability of an executor in that case, we held that the arrangement for payment of unpaid taxes by a third party has no effect on the executor's liability for those taxes. Id.

The agreements in Coppola and Estate of Frost are distinguishable from the facts at hand. Neither case addressed whether the agreements affected the estate's solvency or dealt with the value of contribution rights from third parties. Additionally, petitioner does not argue that the contribution rights should absolve him of liability but rather argues, rightly so, that they should be counted as assets of the estate when calculating the estate's solvency. In conclusion, respondent has not met his burden of proving the estate's insolvency, and therefore one of the

[*24] elements for fiduciary liability is lacking.  We find that petitioner is not liable as a fiduciary for the distribution from the estate of $422,694.

Petitioner makes a number of additional arguments as to why he is not liable as a fiduciary, including that:  (1) the statute of limitations bars collection by respondent pursuant to section 6324; (2) a defense of laches is applicable because the Government has failed to collect the estate's estate taxes for nearly 25 years and petitioner would suffer prejudice from the Government's efforts to collect the tax from him; (3) respondent should be equitably estopped from pursuing petitioner because he relied to his detriment on statements and omissions from respondent; and (4) petitioner did not make a distribution but merely authorized the release of funds pursuant to an agreement ordered by the surrogate's court.  In the light of our decision above, we need not address petitioner's remaining arguments and decline to make any findings about their merits.

In reaching our holding, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

for petitioner.